**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**HUNTINGTON DIVISION**

**BRYAN DONALD MURPHY,**

     **Plaintiff,**

**v.**                           **Case No.:   3:13-cv-28760**

**INTERNATIONAL PAINTERS AND
ALLIED TRADES INDUSTRY
PENSION FUND, et al.,**

     **Defendants.**

## PROPOSED FINDINGS AND RECOMMENDATIONS

On November 13, 2013, Plaintiff Bryan Donald Murphy ("Plaintiff") filed his *pro se* complaint under the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §§ 1001–1461, against Defendants International Painters and Allied Trades Industry Pension Fund ("Pension Fund"); Gary Meyers, Fund Administrator; and Board of Trustees of the International Painters and Allied Trades Industry Fund ("Trustees"; all three of the Defendants will be collectively referred to as "Defendants" throughout). (ECF No. 3). Currently pending before the Court are the parties' cross-motions for summary judgment on the six claims alleged in Plaintiff's complaint. (ECF Nos. 29 & 31). Defendants have filed a copy of the administrative record, (ECF No. 26), and all parties have filed briefs in support of their motions for summary judgment, as well as responses to the opposing party's motion for summary judgment. (ECF Nos. 30, 32, 34, & 35). Defendants have also filed a reply to Plaintiff's responsive brief. (ECF No. 36). This matter is assigned to the

Honorable Robert C. Chambers, United States District Judge, and is referred to the undersigned United States Magistrate Judge for submission of proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B).

For the reasons set forth herein, the undersigned **RECOMMENDS** that Plaintiff's motion for summary judgment be **GRANTED in part** and **DENIED in part.** Specifically, the undersigned **RECOMMENDS** that Plaintiff's motion for summary judgment be **GRANTED** with respect to part of Count III and all of Count VI.[1] The undersigned further **RECOMMENDS** that Defendants' motion for summary judgment be **GRANTED in part** and **DENIED in part.** Specifically, the undersigned **RECOMMENDS** that Defendants' motion for summary judgment be **GRANTED** with respect to Counts I, II, a portion of Count III, Count IV, and Count V. In addition, the undersigned **RECOMMENDS** that the District Court **FIND** that a genuine issue of material fact exists as to part of Count III. Finally, the undersigned **RECOMMENDS** that the District Court **AWARD** the sum of Seven Thousand Four Hundred Fifty Dollars and No Cents ($7,450.00) to Plaintiff.

## I.    Relevant Facts

Before delving into the more particular facts of this case, it is worth exploring how the Pension Fund operates. The Pension Fund is administered by the Trustees who hire a Fund Administrator—in this case, Mr. Meyers[2]—"to keep records and make benefit payments." (D1051, D1276).[3] In order to obtain certain benefits from the Pension Fund,

---

[1] Plaintiff mistakenly labels two of his claims as "Count V." The second "Count V," referred to as Count VI by the undersigned, is a claim for costs. (ECF No. 3 at 33).

[2] According to Defendants' brief in support of summary judgment, Mr. Meyers retired from the Pension Fund in April 2014. (ECF No. 32 at 1).

[3] Citations are to the page numbers in the administrative record. (Filed at ECF Nos. 26, 26-1 through 26-15).

such as a disability pension, a participant in the Pension Fund must apply for benefits by contacting the Fund Office and filling out any necessary paperwork. (D1046, D1128, D1267). Eligibility for benefits from the Pension Fund, including a disability pension, is determined by reading the terms of the pension plan applicable to the participant. After an application for benefits is filed by a participant, the application is processed by the Fund Office at the initial claim determination level, and the participant is subsequently notified if his or her application is approved or denied. (D1129). If the participant's application is denied, then he or she may appeal that decision to the Trustees. (D1047, D1129, D1269). After reviewing an appeal, the Trustees provide the participant with written notice of their decision and, if the decision is adverse to the participant, an explanation of the participant's right to file suit under ERISA. (D1047, D1129-30, D1269-70).[4]

In this case, Plaintiff has been a participant in the Pension Fund since at least 1985. (D0005). From that time until December 2002, Plaintiff worked as a painter and sandblaster in employment that was covered by the Pension Fund. (D0001, D0015, D0024, D0090; ECF No. 30 at 1). According to Plaintiff, he was unable to continue working in December 2002 as a result of complications that arose from a work-related injury that he sustained approximately fourteen months earlier on October 11, 2001 when he hit his head on a protruding piece of iron while climbing scaffolding. (D0065, D0217; ECF No. 30 at 1). Plaintiff worked at least 741 hours between the time of his alleged work-related injury in October 2001 and when he decided to stop working in December 2002. (D0015). At the time that he stopped working, Plaintiff was a vested participant with

---

[4] This summary of the claims process relies on various versions of pension plans and summary plan descriptions. While the phrasing is not consistent among the documents, this is the process generally described in each document in the administrative record.

regard to *retirement* benefits in the Pension Fund as a result of earning eleven years of vesting service.[5] (D0004, D0015, D1078-79).

Plaintiff subsequently filed for workers' compensation benefits with the Ohio Bureau of Workers' Compensation, and his claim was allowed on the basis of cervical sprain in April 2003 by a district hearing officer with the Industrial Commission of Ohio ("ICO"). (D0065). An ICO district hearing officer stopped Plaintiff's receipt of workers' compensation benefits as a result of "maximum medical[] improvement" on November 23, 2004; however, in April 2005, a different district hearing officer granted Plaintiff's request for payment of workers' compensation benefits dating back to November 24, 2004, as result of his dizziness and disequilibrium, which the ICO district hearing officer found to be "new and changed circumstances supporting a reinstatement of temporary total disability compensation." (D0068, D0070). On January 29, 2008, the ICO found that Plaintiff was entitled to "permanent total disability compensation" beginning on February 12, 2007 and continuing indefinitely. (D0089-90).

In addition to workers' compensation benefits, Plaintiff also twice applied to receive disability insurance benefits ("DIB") from the Social Security Administration ("SSA"). (D0093). Both parties agree that Plaintiff's initial application for DIB was denied by Administrative Law Judge Charlie Paul Andrus ("ALJ Andrus") on April 25, 2006, and that ALJ Andrus's decision was subsequently affirmed by the SSA Appeals Council and the Honorable Maurice G. Taylor, Jr., United States Magistrate Judge for the Southern

---

[5] A participant is credited with one year of vesting service for each year that he or she works at least 1000 hours in covered employment. (D1079). A vested participant is a "[p]articipant who has fulfilled the requirements for receipt, upon attainment of Normal Retirement Age or Retirement, of a nonforfeitable pension based on service, age or termination of the [Fund]." (D1078). A participant becomes vested when he or she has completed ten years of vesting service before an unrepaired one-year break and has one or more hours of service after January 1, 1976. (D1078).

District of West Virginia.[6] (ECF No. 30 at 7; ECF No. 32 at 6). Plaintiff filed his second application for DIB, along with an application for supplemental security income benefits, in August 2006. (D0100). Administrative Law Judge Andrew J. Chwalibog ("ALJ Chwalibog") noted in his March 6, 2013 decision that Plaintiff had alleged a disability onset date of December 21, 2002 in his application, yet, the first day that Plaintiff could receive DIB was the day after ALJ Andrus's decision denying Plaintiff benefits, i.e. April 26, 2006. (D0093, D0100). ALJ Chwalibog ultimately found that Plaintiff was disabled as defined by the Social Security Act from April 26, 2006 through the date of his decision. (D0100). Accordingly, the onset date of Plaintiff's disability as determined by ALJ Chwalibog was April 26, 2006. (D0017, D0100).

While Plaintiff's second application for DIB was pending, he sought a disability pension from the Pension Fund on February 26, 2008. (D0012-13).[7] The version of the pension plan in effect at the time of Plaintiff's application for a disability pension required that he receive a determination by the SSA that he was entitled to DIB before he could receive disability pension benefits from the Pension Fund.[8] (D1097, D1159, D1177-78). After obtaining a favorable decision from the SSA in March 2013, Plaintiff sent a letter to Mr. Meyers in support of his February 2008 application for disability pension benefits. (D0022). In that April 2013 letter, Plaintiff insisted that he met all of the requirements for a disability pension under the language of the 2003 pension plan, as described by the

---

[6] Neither ALJ Andrus's nor Judge Taylor's decision is a part of the administrative record. Judge Taylor's opinion reflects that Plaintiff first applied for DIB on January 20, 2004, and that he alleged a disability onset date of December 21, 2002. *Murphy v. Astrue*, No. 3:06-0669, 2009 WL 1789427, at *1 (S.D.W.Va. June 22, 2009).

[7] The pension application form filled out directed the applicant to a summary plan description ("SPD") other than the 2006 SPD. (*See* D0012, D1031-32).

[8] The 1999 version of the pension plan, as described by the 1999 SPD, and the 2010 version of the pension plan also made an award of DIB by the SSA a prerequisite to disability pension benefits. (D1019, D1342, D1409).

2003 summary plan description ("SPD"), which Plaintiff stated was in effect at the time of his 2008 application.[9] (D0023). Specifically, Plaintiff relayed that the 2003 SPD listed six requirements to receive a disability pension under the 2003 pension plan. (D0023, D1097). The six requirements contained in the 2003 pension plan are:

> (1) [The participant] is Totally and Permanently Disabled prior to attainment of age 65;[10]
>
> (2) has at least 18,000 Benefit Hours;
>
> (3) has at least 18,000 Benefit Hours during the Contribution Period, or at least 1800 Hours of Service in Covered Employment during the 24 months following the beginning of the Contribution Period;
>
> (4) has at least 1000 Hours of Service in Covered Employment in the two Calendar Years prior to the year in which he or she became disabled;
>
> (5) has not at any time performed any Noncovered Employment, and
>
> (6) applies for a disability pension prior to, or within 12 months following the Social Security disability award determination.

(D1097). "Totally and Permanently Disabled" is defined by the 2003 pension plan as "an illness or injury that has resulted in a determination by the [SSA] that the Participant is entitled to Social Security disability benefits." (D1159). The 2003 pension plan was later amended on September 13, 2004 to remove the sixth requirement, which is not in dispute here. (D1177-78).

In discussing these six requirements as set forth in the 2003 SPD, Plaintiff asserted that, although the SSA determined his disability onset date was April 2006, his

---

[9] "An SPD is a summary of a participant's benefits written in a manner calculated to be understood by the average plan participant." *Frye v. Metropolitan Life Ins. Co.*, No. 3:10-0107, 2010 WL 5343287, at *14 (S.D.W.Va. Dec. 20, 2010). According to both parties, there is a 2003 SPD, which is not contained in the administrative record, but was received by Plaintiff in 2008. (ECF No. 17 at 2; ECF No. 30 at 44). According to Defendants, the 2003 SPD states the 1000-hour requirement as follows: "You are eligible for a Disability Retirement pension if ... you have at least a total of 1000 hours in contributory Covered Employment during the two (2) calendar years prior to the year in which the onset of total and permanent disability occurred." (ECF No. 17 at 2).

[10] Plaintiff was born in 1964. (D0034).

6

actual disability onset date was December 2002. (D0024, D0026-29). In support of his position, Plaintiff attached to his letter records from the ICO and medical records for treatment that he received from 2001 through 2006. (D0026, D0027-29, D0065-91, D0102-151, D0169-189). Additionally, Plaintiff argued that ALJ Chwalibog's decision granting him DIB was based on medical conditions that predated April 2006. (D0027-29).

On May 20, 2013, Plaintiff sent another letter to Mr. Meyers. (D0245). He described a previous conversation with Mr. Meyers whereby Mr. Meyers notified Plaintiff that he would likely be issuing a denial letter with regard to Plaintiff's application for disability pension benefits because Plaintiff had not worked 1000 hours in the two years immediately preceding Plaintiff's onset of disability date (requirement number four above). (D0245). As the SSA had determined that Plaintiff's disability onset date was April 26, 2006, and Plaintiff had not worked in 2004 and 2005, Mr. Meyers opined that Plaintiff did not meet the fourth requirement to receive a disability pension under the terms of the pension plan. (D0245). Plaintiff again protested that his actual onset date was December 21, 2002 according to the records of the ICO and his treating physicians. (D0245).

On May 22, 2013, at 8:44 a.m., Plaintiff and Mr. Meyers discussed Plaintiff's application for disability pension benefits on the telephone. (D0196). Mr. Meyers indicated that he had reviewed the information that Plaintiff had submitted and would be approving Plaintiff's application for benefits back to 2006.[11] (D0196). Approximately three hours later, Angie Keels, a pension analyst for the Fund Office, called Plaintiff and

---

[11] Defendants do not dispute that Mr. Meyers told Plaintiff that he was eligible for disability benefits in May 2013, and Plaintiff maintains that he possesses an audio recording of this conversation. (ECF No. 30 at 10; ECF No. 32 at 8).

informed him that his application was going to be denied, but before she could issue a denial, she requested that Plaintiff fill out another pension application. (D0196). Plaintiff refused and requested that a decision be issued on his 2008 application as he believed that the pension plan terms for determining disability onset date had changed between the filing of his application in 2008 and the time of the phone call. (D0196-97). In response, Ms. Keels agreed to issue a denial of Plaintiff's 2008 application. (D0197). At approximately 3:00 p.m. that same day, Mr. Meyers called Plaintiff and stated that he was incorrect when he told Plaintiff that his application was being approved and that this incorrect information was obtained from a pension analyst in the Fund Office. (D0197). Mr. Meyers also indicated that after further review by a different pension analyst, he was advised that Plaintiff did not meet the 1000-hour requirement. (D0197). Accordingly, Mr. Meyers sent Plaintiff a denial letter dated May 22, 2013, stating that Plaintiff was a vested participant and had earned 19,950 benefit hours from 1985 through 2002, but he did not meet the 1000-hour requirement for a disability pension as the SSA determined his disability onset date was April 26, 2006, and he had not worked at least 1000 hours (or any amount of hours) in covered employment for the two-year period preceding his disability onset date (2004 and 2005). (D0194). By that time, a 2010 version of the pension existed, however, the denial letter did not inform Plaintiff which version of the plan, the amended 2003 or 2010, was used in determining Plaintiff's application.[12]

On June 3, 2013, Plaintiff faxed a letter to Mr. Meyers requesting "complete copies . . . of any and all documents governing the operation of the plan that may be used,

---

[12] The language related to the disability-pension requirements quoted by the denial letter is the same in both the amended 2003 and 2010 plans. (D0194, D1177-78, D1342). While the amended 2003 plan does not capitalize the beginning of its disability eligibility clauses and the 2010 plan does capitalize the beginning of those clauses, the stylistic choice of Mr. Meyers to use non-capital letters at the beginning of clauses in the denial letter is not significant enough to definitively state that he utilized the amended 2003 plan in deciding Plaintiff's application.

referred to, considered or control any decision with respect to [Plaintiff's] application for disability retirement filed on March 5, 2008."[13] (D0198). More specifically, Plaintiff asked that he be provided "all documents, records, and other information that is relevant and has been used to consider [his] claim with a complete copy of [his] application filed on March 5, 2008." (D0198). On June 18, 2013, Plaintiff faxed another letter to Mr. Meyers, this time requesting "a complete copy of [his] claim file," copies of all "Plan documents filed with the Department of Labor including the Plan's Form 5500,"[14] and copies of the pension plan and SPD that were in effect in December 2002 along with copies of any subsequent amendments to those documents. (D0210). Mr. Meyers responded by letter to Plaintiff's requests on June 20, 2013, and attached to his letter copies of the 1999 SPD, the 2003 pension plan, Plaintiff's contribution details report, Plaintiff's March 5, 2008 application, and the SSA award letter. (D0212; ECF No. 30 at 13).

In July 2013, Plaintiff appealed the denial of his application to the Trustees. (D0213-38). He again argued that he was disabled prior to the onset date established by the SSA and that the initial determination was improperly based on *only* the onset date

---

[13] The letter is stamped "received" on June 5, 2013; however, the fax cover sheet has what appears to be a receipt date of June 3, 2013. (D0198-99).

[14] The Department of Labor's website describes the "Form 5500 Series":

> The Department of Labor, Internal Revenue Service, and the Pension Benefit Guaranty Corporation jointly developed the Form 5500 Series so employee benefit plans could utilize the Form 5500 Series forms to satisfy annual reporting requirements under Title I and Title IV of ERISA and under the Internal Revenue Code.

> The Form 5500 Series is an important compliance, research, and disclosure tool for the Department of Labor, a disclosure document for plan participants and beneficiaries, and a source of information and data for use by other Federal agencies, Congress, and the private sector in assessing employee benefit, tax, and economic trends and policies. The Form 5500 Series is part of ERISA's overall reporting and disclosure framework, which is intended to assure that employee benefit plans are operated and managed in accordance with certain prescribed standards and that participants and beneficiaries, as well as regulators, are provided or have access to sufficient information to protect the rights and benefits of participants and beneficiaries under employee benefit plans.

http://www.dol.gov/ebsa/5500main.html (last visited Mar. 31, 2015).

contained in ALJ Chwalibog's decision without considering any of the other evidence submitted by Plaintiff. (D0217, D0225). In a July 24, 2013 letter to Plaintiff, Mr. Meyers acknowledged Plaintiff's appeal and also attached additional documents to the letter, including copies of the 2011 Form 5500, the current SPD (the 2006 SPD), and Plaintiff's complete administrative file. (D0295). In September 2013, the Trustees denied Plaintiff's appeal reasoning that Plaintiff did not have 1000 benefit hours of service in covered employment in the two years prior to the year that he became disabled according to the SSA. (D0298). The appeal denial letter recognized that Plaintiff had submitted medical records in support of his claim, but asserted that the onset date determined by the SSA is the controlling date for purposes of the pension plan. (D0298). The denial letter also noted that the inability to perform work under the pension plan was not equivalent to an inability to perform all work. (D0299).

## II.    <u>Complaint and Cross-Motions for Summary Judgment</u>

Plaintiff alleges six causes of action in his complaint: (1) a claim to "enforce and clarify benefits"; (2) breach of fiduciary duty; (3) failure to provide required documents; (4) bad faith/gross negligence; (5) equitable estoppel; and (6) a claim for fees and costs. (ECF No. 3 at 20-33). In his first claim, Plaintiff asserts that he is entitled to disability pension benefits under the terms of the pension plan documents because he became disabled in December 2002, as evidenced by his medical and ICO records, and the two years preceding the onset of his disability (2000 and 2001), he worked 1000 hours. (*Id.* at 20-21). Plaintiff's breach of fiduciary duty claim alleges that Defendants failed to produce information and documents that he requested and that Defendants breached their duty by failing to follow the terms of the plan, failing to consider evidence that he submitted, and failing to treat his claim "reasonably and fairly." (*Id.* at 22-23). Plaintiff also alleges

that Defendants breached their fiduciary duties by failing to conduct their review in his best interest. (*Id.* at 23). In his third cause of action (failure to provide documents), Plaintiff generally alleges that the responses by Mr. Meyers to his requests for documents were inadequate and that the Pension Fund "has refused to provide all relevant documents, record and information that has been relied upon, submitted, considered or generated in the course of making [his] benefit determination." (*Id.* at 25-27). He specifically asserts that the Pension Fund failed to provide him with copies of the pension plan in effect as of December 2002, all amendments to the pension plan and SPD since December 2002, and the most recent Form 5500. (*Id.* at 27-28).

In his bad faith and gross negligence cause of action, Plaintiff maintains that Defendants attempted to delay consideration of or deny his application for benefits prior to May 2013 by misplacing documents or asserting that Plaintiff did not meet the vesting requirement. (*Id.* at 29). He also claims that Defendants acted in bad faith or with gross negligence when they failed to provide requested documents, failed to identify and produce the version of the pension plan that his application was decided under, and changed their initial determination from approval to denial on the same day. (*Id.* at 29-30).

Plaintiff's equitable estoppel claim contains a number of components. First, Plaintiff alleges that Defendants should be equitably estopped from denying him disability pension benefits given Mr. Meyers's representation that Plaintiff's application was approved on May 22, 2013. (*Id.* at 30-31). Plaintiff also claims that Defendants are equitably estopped from denying his application because "the [SPD] distributed to employees conflicts with the language of the plan itself." (*Id.* at 32). Moreover, Plaintiff alleges that Defendants are equitably estopped from relying on any post-2003 SPD or

11

plan version because he never received copies of those documents. (*Id.*) Additionally, Plaintiff alleges that Defendants are equitably estopped from denying him benefits because the Pension Fund failed to explain in the SPD what circumstances would result in disqualification, ineligibility, denial or loss of benefits. (*Id.*) Finally, Plaintiff asserts that Defendants are equitably estopped from denying his application as the 1000-hour requirement was impossible for him to meet given his disability onset in 2002 and Defendants should not be permitted to determine benefit eligibility based on reasons that are out of the applicant's control. (*Id.* at 32-33).

Both Plaintiff and Defendants have filed motions for summary judgment and briefs in support of those motions. (ECF Nos. 29, 30, 31, & 32). In addition, the parties have filed responsive briefs, and Defendants have filed a reply to Plaintiff's responsive brief. (ECF Nos. 34, 35, & 36). The arguments made and pertinent authorities cited in those briefs are discussed below.

## III.  __Standard of Review__

There are two separate standards of review that must be discussed and applied in this case. First, the undersigned must determine the standard of review applicable to Plaintiff's claim seeking review of the Trustees' denial of his benefit application, i.e. the standard of review for Plaintiff's first cause of action. On this issue, the parties disagree. Second, the undersigned will discuss the typical summary judgment standard of review applicable to the remainder of Plaintiff's claims. The parties seem to agree on that standard.

### A. Standard of Review for Plaintiff's Benefits Claim

Beginning with the former, "[u]nder ERISA, courts must review an administrator's decision to deny pension plan benefits *de novo*, unless the plan itself confers

discretionary authority upon the administrator 'to determine eligibility for benefits or to construe the terms of the plan.'" *Chaffin v. NiSource, Inc.*, 703 F. Supp. 2d 579, 590 (S.D.W.Va. 2010) (quoting *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989)). Plaintiff insists that *de novo* review of the Trustees' decision is appropriate in this case because he believes that the 1999 version of the pension plan applies to his application, and since Defendants neither produced a complete copy of the 1999 pension plan to Plaintiff nor supplied a complete copy of the 1999 pension plan with the administrative record, the Court should not allow Defendants "any subjective discretionary authority not specifically contained in the record of this case." (ECF No. 30 at 19). In addition, Plaintiff avers that *de novo* review is applicable for a host of other reasons, including the Trustees' errors of law, disregard for the purpose of the pension plan, and inattention to the plain language of the pension plan. (*Id.* at 20).

On the other hand, Defendants insist that an abuse of discretion standard should be applied by the Court as both the 1999 plan and the 2003 plan, which Defendants believe is the controlling plan, "clearly provide[] the [Trustees] with interpretive discretion that is applicable to all participants and claims." (ECF No. 32 at 3, 12). In support of their position, Defendants attach to their motion a copy of page 55 from the 1999 pension plan that provides:

Section 9.04 Trustee Discretion and Authority

The Trustees shall, subject to the requirements of the law, be the sole judges of the standard of proof required in any case and the application and interpretation of this Plan. The Trustees shall have the exclusive right and discretionary authority to construe the terms of the Plan, to resolve any ambiguities and to determine any questions which may arise in connection with the Plan's application or administration, including but not limited to determination of eligibility for benefits. Wherever the Trustees are given discretionary powers, the Trustees shall exercise such powers in a uniform and nondiscriminatory manner.

13

(ECF No. 31-3 at 6). The 2003 and 2010 versions of the pension plan, which are contained in the administrative record, include identical reservations of discretion. (D1128-29, D1375). In response to Defendants' reliance on the portion of the 1999 pension plan, Plaintiff persists that the Court should not consider this evidence as it is outside of the administrative record filed with the Court. Additionally, he argues that he has been placed at a disadvantage as a result of Defendants' failure to provide him with a complete copy of the 1999 plan.

As to Plaintiff's first point, the Court may consider evidence outside of the administrative record when deciding the appropriate standard of review in an ERISA action. *See Farley v. Arkansas Blue Cross & Blue Shield*, 147 F.3d 774, 776 n.4 (8th Cir. 1998) ("We note, however, that conducting limited discovery for the purpose of determining the appropriate standard of review does not run afoul of the general prohibition on admitting evidence outside the administrative record for the purpose of determining benefits."); *Garg v. Winterthur Life*, 573 F. Supp. 2d 763, 771 (E.D.N.Y. 2008) (permitting discovery in ERISA case on appropriate standard of review); *Scruggs v. ExxonMobil Pension Plan*, No. CIV-06-0465-F, 2008 WL 2704614, at *2 n.2 (W.D. Okla. June 30, 2008) (recognizing that proper standard of review is "legal matter for the court to determine," and as such, evidence outside of administrative record may be considered in deciding issue); *Archuleta v. Reliance Standard Life Ins. Co.*, 504 F. Supp. 2d 876, 882 (C.D. Cal. 2007) ("Evidence not contained in the administrative record is relevant to the appropriate standard of review and may be considered by the Court in making that determination."). Furthermore, in ERISA actions, "the [the United States Court of Appeals for the] Fourth Circuit has 'focused on whether evidence was known to the administrator when it rendered its decision, not whether it was part of the

administrative record.'" *Stump v. Wachovia Group Long Term Disability Plan*, No. 7:13cv00462, 2014 WL 4923223, at *9 (W.D. Va. Sept. 30, 2014) (quoting *Helton v. AT & T Inc.*, 709 F.3d 343, 352 (4th Cir. 2013)). Certainly the 1999 pension plan was known to Defendants when they rendered their decision. *See Kane v. UPS Pension Plan Bd. of Trs.*, No. RDB-11-03719, 2013 WL 6502874, at *5 (D. Md. Dec. 11, 2013) (finding that plan documents "are obviously of the type to be considered even if not included in the administrative record."). Accordingly, the Court may consider the portion of the 1999 pension plan provided by Defendants.

Nonetheless, Plaintiff's argument that it would be unfair to consider that portion of the 1999 pension plan remains. He insists that because he never received a copy of the 1999 plan, *de novo* review should be applied. (ECF No. 34 at 2). However, Plaintiff's position has been persuasively rejected by other federal courts. *Thurber v. Aetna Life Ins. Co.*, 712 F.3d 654, 659-60 (2d Cir. 2013); *McDonough v. Aetna Life Ins. Co.*, No. 11-11167-DPW, 2014 WL 690319, at *11-*12 (D. Mass. Feb. 19, 2014). As the Second Circuit explained in *Thurber*, the provision in a pension plan relating to administrator discretion is effectively addressed toward a reviewing court and not toward participants in the plan. 712 F.3d at 660. As such, a participant is hard-pressed to demonstrate prejudice from lack of notice that an administrator retains discretionary authority, unlike a situation where a participant is not notified of how to apply for benefits or what requirements he or she must meet to receive benefits. Moreover, as the Second Circuit forcefully pointed out, "an actual notice standard would make the standard of review different for each individual applicant, based on resolution by reviewing courts of factual disputes," which is a wholly undesirable outcome. *Id.* Consequently, Plaintiff's unfairness argument is unconvincing.

15

That said, even though the undersigned need not reach the issue at this juncture as the plan language concerning discretion is identical in the 1999, 2003, and 2010 plan versions, Plaintiff's standard of review argument also fails because the 1999 version of the plan does not apply in this case.[15] *See Jordan v. Retirement Comm. of Rensselaer Polytechnic Inst.*, 46 F. 3d 1264, 1269 (2d Cir. 1995) (declining to decide which of two versions of retirement plan controlled where both versions provided retirement committee with discretion to interpret plan's terms). There is some apparent contention among federal courts on this issue. Some courts, including the Fourth Circuit in an unpublished decision, have decided the version of a plan that controls is that which is in place at the time that a participant's application for benefits is ***denied***. *Hackett v. Xerox Corp. Long-Term Disability Income Plan*, 315 F.3d 771, 774 (7th Cir. 2003); *Grosz-Salomon v. Paul Revere Life Ins. Co.*, 237 F.3d 1154, 1159-61 (9th Cir. 2001); *McWilliams v. Metropolitan Life Ins. Co.*, 172 F.3d 863, 1999 WL 64275, at *2 (4th Cir. Feb. 11, 1999) (unpublished table decision); *Lanning v. Eaton Corp.*, No. 1:06CV52, 2007 WL 1219954, at *5-*6 (W.D.N.C. Apr. 24, 2007). Other courts, including Judge Copenhaver of this Court, have looked to the plan in effect at the time an application for benefits is ***filed***. *Grass v. Eastern Associated Coal LLC*, No. CIVA 205-0496, 2006 WL 2527810, at *2 n.2 (S.D.W.Va. Aug. 28, 2006) (Copenhaver, J.);[16] *see also Snyder v. Titus*, 513 F. Supp. 926, 931-32 & n.5 (E.D. Va. 1981) (recognizing that "in pension claims cases . . . the version of the plan in effect at the time an employee's application is filed or is ruled upon is

---

[15] The undersigned addresses the issue at this point because it recurs throughout the parties' briefs and has some effect on Plaintiff's failure to provide documents claim.

[16] In *Grass*, prior to the entry of its opinion cited above, the Court entered an order directing the defendant, which administered a sickness and accident benefits plan, to file a copy of the plan in effect at the time of the plaintiff's application for benefits under the plan. *Grass v. Eastern Associated Coal LLC*, No. 2:05-0496, ECF No. 40 at 1 (S.D.W.Va. Aug. 15, 2006).

controlling in determining entitlements," and stating that application of plan at time of denial seemed appropriate unless that version of plan would arbitrarily and capriciously deprive pensioner of benefits). In those cases where courts have applied the version of a plan in place at the time of application *denial*, the courts have recognized that, under ERISA, disability benefits covered by an employee welfare benefit plan[17] do not vest unless the plan clearly states that such benefits are subject to vesting.[18] *Hackett*, 315 F.3d at 774; *Grosz-Salomon*, 237 F.3d at 1160; *Lanning*, 2007 WL 1219954, at *5; *see also Webster v. Black & Decker (U.S.) Inc.*, 33 F. App'x 69, 75 (4th Cir. 2002) ("It is well-established . . . that no vested right to benefits accrues under an employee welfare benefit plan absent a clearly stated obligation to this effect in the plan's policies."). Consequently, unless vesting of disability benefits is promised by the plan, the employer is free to alter the receipt of those benefits or eliminate those benefits entirely in later plan versions. *See M & G Polymers USA, LLC v. Tackett*, ____ U.S. ____, 135 S.Ct. 926, 933, 190 L.Ed.2d 809 (2015) ("'Employers or other plan sponsors are generally free under ERISA, for any reason at any time, to adopt, modify, or terminate welfare plans' . . . .") (quoting *Curtiss–Wright Corp. v. Schoonejongen*, 514 U.S. 73, 78, 115 S.Ct. 1223, 131 L.Ed.2d 94 (1995)). Thus, the argument goes, it is appropriate to apply the version of the plan in effect at the time of the denial since the employer is free to change the welfare benefit plan terms until

---

[17] ERISA separates plans into two types: pension plans and welfare benefits plans. "ERISA defines pension plans as plans, funds, or programs that provid[e] retirement income to employees or that resul[t] in a deferral of income. It defines welfare benefits plans as plans, funds, or programs established or maintained to provide participants with additional benefits, such as life insurance and disability coverage." *M & G Polymers USA, LLC v. Tackett*, ____ U.S. ____, 135 S.Ct. 926, 933, 190 L.Ed.2d 809 (2015) (some markings and citations omitted). "Disability retirement pension provisions of a pension plan are an employee welfare benefit plan, not an employee pension benefit plan, within the meaning of ERISA." 70 C.J.S. *Pensions* § 117 (2015).

[18] Vesting is "'the process by which an employee's already-accrued pension account becomes irrevocably his property.'" *Bush v. Employer-Teamsters Local Nos. 175/505 Pension Trust Fund*, 785 F. Supp. 2d 574, 577 (S.D.W.Va. 2011) (quoting *Central Laborers' Pension Fund v. Heinz*, 541 U.S. 739, 749, 124 S.Ct. 2230, 159 L.Ed.2d 46 (2004)).

it decides the participant's application. On the other hand, in *Grass*, where Judge Copenhaver noted that the plan in effect at the time of the participant's application determined his eligibility for benefits, the issue was the timeliness of the participant's application. 2006 WL 2527810, at *2-*3. Therefore, it was logical for the court to look to the timing requirements for submitting applications at the time that the participant submitted his application.

Evening assuming, *arguendo*, that there is some tension between these two lines of thought, there is no practical difference here. Under the time of **denial** approach, the 1999 version of the plan does not apply unless the plan contains "clear and express language" subjecting disability pension benefits to vesting *and* Plaintiff met the plan requirements for disability pension benefit vesting at the time that the 1999 plan was in place. *Gable v. Sweetheart Cup Co.*, 35 F.3d 851, 855 (4th Cir. 1994) (markings omitted); *see also Wheeler v. Dynamic Engineering, Inc.*, 62 F.3d 634, 638 (4th Cir. 1995) (recognizing that court must determine whether participant's coverage ever vested under prior plan). Notwithstanding Plaintiff's argument to the contrary, (ECF No. 34 at 11-14), the 1999 plan language is far from clear that disability benefits are vested benefits. For example, the plan states on page two that, except as permitted by law, the plan cannot be amended to "eliminate or reduce an early retirement benefit, retirement type subsidy or optional form of payment with respect to Hours of Service before the amendment."[19] However, in specifically discussing disability pension benefits, page 28 of the 1999 plan states that the Trustees may ask the disability pension benefit recipient to submit proof of

---

[19] The undersigned has obtained a complete copy of the 1999 plan from the record in *Schwartz v. Int'l Painters & Allied Trades Indus. Pension Fund*, No. 8:10-cv-02303-RWT, ECF No. 22-19 (D. Md. April 4, 2011). The undersigned may consider the 1999 plan even though the plan is not contained in the administrative record. *Kane v. UPS Pension Plan Bd. of Trs.*, No. RDB-11-03719, 2013 WL 6502874, at *5 (D. Md. Dec. 11, 2013).

continuing entitlement to DIB, and if the participant cannot do so, then disability pension benefits are discontinued. *Cf. Webster*, 33 F. App'x at 75 (holding plan did not create vested benefit right where plan required annual submission of evidence to plan administrator to substantiate continuing disability); *Lanning*, 2007 WL 1219954, at *5 (finding plan did not create vested benefit right where plan required continued submission of evidence of disability). As such, the 1999 plan is not explicitly clear that disability benefits are meant to vest. Moreover, as discussed in greater detail below, Plaintiff did not meet the 1999 plan requirements for vesting of disability pension benefits, and therefore, the 1999 plan does not apply to this case.[20]

In the event that the 1999 plan does not apply for any of the reasons stated above, Plaintiff asserts that the 1999 plan controls as result of language contained in the ***2003*** plan. (ECF No. 34 at 5). Specifically, the 2003 plan states:

Section 1.04 Plan Effective Date

(a) This restated Plan is applicable to eligible Employees, Participants and their Spouses and Beneficiaries as follows:

. . . .

(c) Benefit Levels. The benefit calculation and retirement eligibility and amount provisions described in Articles 5-6 [Article 6 concerns disability pension benefits] apply only to Eligible Employees and Participants who were Active Employees in the Plan as of January 1, 2003 or thereafter and before a Benefit Break-in-Continuity.

(d) The amount of pension benefits, for participants who retired before January 1, 2003, as well as the amount of pension benefits and retirement eligibility of former Employees whose participation terminated prior to January 1, 2003, are determined in accordance with the provisions of the Plan in effect at the earlier of the time the Employee or Participant left Covered Employment or retired.

---

[20] In support of his vested disability pension benefits argument, Plaintiff cites *Cotter v. E. Conference of Teamsters Retirement Plan*, 898 F.2d 424 (4th Cir. 1990). (ECF No. 30 at 18). However, that case concerned normal retirement benefits, not disability pension benefits, and the two types of benefits are treated differently under ERISA. *Cotter*, 898 F.2d at 428; *see also Tackett*, 135 S.Ct. at 933.

(e) The amount of pension benefits and retirement eligibility for those who were vested inactive Participants as of January 1, 2003, shall be those stated in the Plan document in effect at the earlier of the time the Participant left Covered Employment or retired.

(D1069). Plaintiff asserts that Section 1.04(d) applies to his situation because he left "Covered Employment" prior to January 1, 2003, and he (presumably) believes that his participation terminated when he left "Covered Employment." (ECF No. 34 at 5). In support of his position, Plaintiff cites *Shore v. Int'l Painters & Allied Trades Indus. Pension Plan*, 418 F. App'x 597 (9th Cir. 2011). (ECF No. 34 at 5). In that case, the Ninth Circuit reviewed the 2003 plan at issue in this case, and determined that the 2003 plan required the plaintiff's pension eligibility "to be determined 'in accordance with the provisions of the Plan in effect at the . . . time the Employee . . . left Covered Employment.'" *Shore*, 418 F. App'x at 599 (quoting 2003 plan language) (ellipses in original). Respectfully, the Ninth Circuit's statement in its unpublished *Shore* decision is an oversimplification of the provision. As pertinent here, Section 1.04(d) states that the plan in effect at the time a "Participant" leaves "Covered Employment" applies where the person is a "former Employee" whose participation in the plan terminated prior to January 1, 2003. (D1069). Section 3.03 of the plan states that participation in the plan does not terminate if the person is a "Vested Participant."[21] (D1075). As stated above, Plaintiff is a "Vested Participant," and as such, it seems Plaintiff's participation in the plan did not end when he stopped working. (D0004). Section 1.04(d) also states that a participant who retires before January 1, 2003, will have their eligibility for benefits determined by the plan in effect at the earlier time between leaving "Covered

---

[21] "Vested Participant" is defined by the 2003 plan as "a Participant who has fulfilled the requirements for receipt, upon attainment of Normal Retirement Age or Retirement, of a nonforfeitable pension based on service, age or termination of the Plan." (D1078).

Employment" and retiring. (D1069). However, the 2003 plan defines "retired" as "a separation from Industry Service that is expected to be permanent, **and** . . . the filing of an application for benefits with the Plan." (D1159) (emphasis added). Here, Plaintiff did not file an application for benefits with the Fund Office prior to 2003, and thus, he was not retired as of January 1, 2003, according to the terms of the 2003 plan.[22]

Accordingly, the undersigned is left with two plan choices—the 2003 version of the plan, which was in effect when Plaintiff's application was filed in 2008, and the 2010 version of the plan, which was in effect when his application was denied by the Trustees in 2013. For disability benefit determination purposes, picking between the two makes no difference in the outcome of this case. The eligibility language for a disability pension is identical between the amended 2003 version and the 2010 version. To the extent that Plaintiff's document production claim hinges on the different plan versions, that issue is discussed in detail below.

Returning to the broader standard of review issue, as noted above, both the 2003 and 2010 plan grant the Trustees discretion to interpret the plan and determine eligibility for benefits. (D1128-29, D1375). "When an administrator possesses such discretion, courts may review the eligibility determination only for an abuse of discretion." *Chaffin*, 703 F. Supp. 2d at 590; *see also Booth v. Wal-Mart Stores, Inc. Assocs. Health & Welfare Plan*, 201 F.3d 335, 341 (4th Cir. 2000). In other words, the Trustees' decision may not be disturbed if it is reasonable. *Bernstein v. CapitalCare, Inc.*, 70 F.3d 783, 787 (4th Cir. 1995). A "decision is reasonable 'if it is the result of a deliberate, principled reasoning process and if it is supported by substantial evidence.'" *Evans v. Eaton Corp. Long Term*

---

[22] Furthermore, there is a reasonable argument that Plaintiff falls within Section 1.04(c) because he was a "Participant" and "*Active* Employee" as of January 1, 2003 under the terms of the 2003 plan. (D1151, D1158). However, it is unclear from the plan whether an employee who no longer works can be an "*Eligible* Employee." (D1074).

*Disability Plan*, 514 F.3d 315, 322 (4th Cir. 2008) (quoting *Bernstein*, 70 F.3d at 788).

The Fourth Circuit has emphasized that:

> The abuse of discretion standard in ERISA cases protects important values: the plan administrator's greater experience and familiarity with plan terms and provisions; the enhanced prospects of achieving consistent application of those terms and provisions that results; the desire of those who establish ERISA plans to preserve at least some role in their administration; and the importance of ensuring that funds which are not unlimited go to those who, according to the terms of the plan, are truly deserving.

*Id.* at 323. Plaintiff bears the burden to establish that he is entitled to benefits. *Childers v. United of Omaha Life Ins. Co.*, No. 3:12-0077, 2013 WL 683498, at *13 (S.D.W.Va. Feb. 22, 2013) (citing *Gallagher v. Reliance Standard Life Ins. Co.*, 305 F.3d 264, 270 (4th Cir.2002)).

### B. Standard of Review for the Remainder of Plaintiff's Claims

Both Plaintiff and Defendants also request summary judgment on the remaining causes of action contained in Plaintiff's complaint pursuant to Federal Rule of Civil Procedure 56. Summary judgment should be granted if the movant shows, through "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for the purposes of the motion only), admissions, interrogatory answers, or other materials," that there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56. The party moving for summary judgment has the initial burden of showing that no genuine issue of material fact is present. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962). A "material fact" is a fact that might affect the outcome of a party's case under the applicable substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct.

2505, 91 L.Ed.2d 202 (1986). Conversely, a fact is not material when it is of no consequence to the outcome, or is irrelevant in light of the governing law. *Id.* In addition, only genuine disputes over material facts "will properly preclude the entry of summary judgment." *Id.*; *JKC Holding Co. v. Wash. Sports Ventures, Inc.*, 264 F.3d 459, 465 (4th Cir. 2001). A dispute is "genuine" when "there is sufficient evidence on which a reasonable jury could return a verdict in favor of the non-moving party." *Cox v. Cnty. of Prince William*, 249 F.3d 295, 299 (4th Cir. 2001) (citing *Anderson*, 477 U.S. at 248).

Once the moving party has met its burden, the non-moving party must affirmatively respond with specific evidence "showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (emphasis in original). A party "cannot create a genuine issue of material fact through mere speculation or the building of one inference upon another." *Beale v. Hardy*, 769 F.2d 213, 214 (4th Cir. 1985) (citing *Barwick v. Celotex Corp.*, 736 F.2d 946, 963 (4th Cir. 1984)). Instead, the non-moving party must offer some "concrete evidence from which a reasonable juror could return a verdict in his favor." *Anderson*, 477 U.S. at 256.

When considering a motion for summary judgment, the court's function is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. In making this determination, the court will view the evidence in the light most favorable to the nonmoving party and draw from it all permissible inferences in that party's favor. *Diebold, Inc.*, 369 U.S. at 655; *Matsushita Elec. Indus. Co.*, 475 U.S. at 587–88.

IV.    **Discussion**

### A. Benefits Claim

Plaintiff argues that Defendants abused their discretion in denying him disability pension benefits for a variety of reasons. First, Plaintiff asserts that the decision is inconsistent with the goal of the plan to provide benefits for "protection" of the participant and his or her family; in particular, Plaintiff believes that the 1000-hour requirement being applied to his case was contradictory to the plan's goal as he was incapable of working in 2004 and 2005. (ECF No. 30 at 20-21). Second, Plaintiff maintains that the Trustees' decision is inconsistent with ERISA because ERISA requires that an SPD contain the "'circumstances which may result in disqualification, ineligibility, or denial or loss of benefits.'" (*Id.* at 23) (quoting 29 U.S.C. § 1022(b)). Plaintiff insists that none of the SPDs describe how the Trustees will determine disability onset date, which Plaintiff believes runs afoul of the aforementioned provision. (*Id.*) Relatedly, he claims that Mr. Meyers and the Trustees failed to provide him with adequate notice of the reasons for the denial of his claim, contrary to 29 C.F.R. § 2560.503-1. (ECF No. 30 at 23). Third, Plaintiff argues that the decision denying benefits was contrary to the plain language of the plan because the plan fails to state that the Trustees will determine disability onset date based exclusively on the SSA's finding as to onset date. (*Id.* at 24). Fourth, Plaintiff asserts that the Trustees' interpretation of the plan renders the disability pension benefit provision meaningless as it fails to provide benefits to those who are disabled. (*Id.* at 25-26). Fifth, Plaintiff argues that the Trustees' interpretation of the plan is inconsistent with other plan language. (*Id.* at 27-29). Sixth, Plaintiff maintains that the decision denying benefits is not supported by substantial evidence given the records that he submitted from the ICO and his medical treatment providers. (*Id.* at 32). Finally,

Plaintiff contends that the Trustees' decision was erroneous as a matter of law because he would have been required to work for two years while disabled in order to receive disability pension benefits. (*Id.* at 33).

Defendants respond that, under the terms of the 2003 plan, Plaintiff was only disabled as of 2006. (ECF No. 32 at 8). They assert that their claims procedure does not involve independently determining whether a participant is disabled and that the Pension Fund does not have its own medical review team. (*Id.* at 8-9). Accordingly, the Pension Fund relies on disability determinations by the SSA in order to save costs. (*Id.* at 9). Consequently, Defendants insist that the Pension Fund "relies entirely" on the SSA's determination as to the *date* that a participant is totally and permanently disabled. (*Id.* at 10). Reviewing the SSA's determination in this case, Defendants assert that because the SSA found that Plaintiff was disabled as of April 2006, he was required to have worked 1000 "Benefit Hours" in the two years before the onset of his permanent disability (2004 and 2005). (*Id.*) Since Plaintiff did not work any hours at all in 2004 and 2005, Defendants insist that he does not meet the requirements for a disability pension under the terms of the 2003 plan. (*Id.* at 10-11). Moreover, Defendants argue that, even assuming that the Pension Fund determined disability, "its decision to rely on the SSA disability onset date would not be arbitrary or capricious." (*Id.* at 11).

The Fourth Circuit has identified a number of factors to be used in the abuse-of-discretion analysis for ERISA cases, including:

> (1) the language of the plan; (2) the purposes and goals of the plan; (3) the adequacy of the materials considered to make the decision and the degree to which they support it; (4) whether the fiduciary's interpretation was consistent with other provisions in the plan and with earlier interpretations of the plan; (5) whether the decisionmaking process was reasoned and principled; (6) whether the decision was consistent with the procedural and substantive requirements of ERISA; (7) any external standard relevant to

the exercise of discretion; and (8) the fiduciary's motives and any conflict of interest it may have.

*Booth*, 201 F.3d at 342-43 (footnote omitted). Not every factor is pertinent in every case, and "no one factor is determinative." *Childers*, 2013 WL 683498, at *21.

Beginning with the plan language in dispute, the amended 2003 and 2010 pension plans contain identical requirements for disability pension eligibility.[23] (D1177-78, D1342). Most relevant here, both plans require that an applicant for a disability pension be "Totally and Permanently Disabled prior to attainment of age 65" and have "1000 Hours of Service in Covered Employment in the two Calendar Years prior to the year in which he or she became disabled." (D1177-78, D1342). "Totally and Permanently Disabled" is defined as "an illness or injury that has resulted in a determination by the [SSA] that the Participant is entitled to Social Security disability benefits." (D1159, D1409). Plaintiff correctly notes that the language of the plan[24] does not explicitly state how the Trustees will determine the onset date of disability. Moreover, the plan uses the term "Totally and Permanently Disabled" in describing the first requirement and just "disabled" in discussing the 1000-hour requirement. Nonetheless, the Trustees interpreted the plan language to require a participant to have met the 1000-requirement in the two years preceding the date of disability onset as determined by the SSA.

If the undersigned were interpreting this plan language *de novo*, then any ambiguity might be construed against the drafter of the plan and in favor of Plaintiff. *See Clark v. Nationwide Mut. Ins. Co.*, 933 F. Supp. 2d 862, 874 (S.D.W.Va. 2013); *see also Masella v. Blue Cross & Blue Shield of Conn., Inc.*, 936 F.2d 98, 107 (2d Cir. 1991). *But*

---

[23] As noted above, the 2003 disability pension language was amended in September 2004. (D1179).

[24] Unless otherwise specified, the undersigned's use of the term "plan" refers to both the amended 2003 and 2010 plans.

*see Brewer v. Lincoln Nat'l Life Ins. Co.*, 921 F.2d 150, 153 (8th Cir. 1990) (declining to apply *contra proferentem* rule of contract interpretation in ERISA context). However, on abuse of discretion review, the undersigned is limited to considering whether the Trustees' interpretation of the disability eligibility provision was reasonable. *See Bernstein,* 70 F.3d at 787; *Childers*, 2013 WL 683498, at *24. The Fourth Circuit has recognized that "when the plan's terms are ambiguous in the sense that its language gives rise to at least two different but reasonable interpretations and when the plan confers discretion on the administrator to interpret the plan and resolve ambiguities, a court defers to the administrator's interpretation by reviewing it only for abuse of discretion." *Colucci v. Agfa Corp. Severance Pay Plan*, 431 F.3d 170, 176 (4th Cir. 2005), *abrogation on other grounds recognized by Champion v. Black & Decker (U.S.) Inc.*, 550 F.3d 353, 355 (4th Cir. 2008). Still "even as an ERISA plan confers discretion on its administrator to interpret the plan, the administrator is not free to alter the terms of the plan or to construe unambiguous terms other than as written." *Colucci*, 431 F.3d at 176.

With the Fourth Circuit's guidance in mind, the undersigned finds that the Trustees' interpretation of the disability pension provision is reasonable. While the plain language of the 1000-hour provision is arguably ambiguous in that it uses the phrase "disabled," rather than the plan-defined term of "Totally and Permanently Disabled," given the plan's reliance on SSA determinations for deciding disability pension eligibility, it is reasonable to interpret the phrase "disabled" in the 1000-hour provision as meaning "Totally and Permanently Disabled." Once that interpretive bridge is crossed, the 1000-hour requirement must look back two years from the date of disability onset as determined by the SSA. It would be illogical for the plan to rely on the SSA's judgment in resolving whether an applicant is disabled, and then not use the SSA's date of disability

onset. Particularly, as the Trustees would then be responsible for determining the onset date, which would necessarily require the costly creation of a medical review team to assess disability pension claims. *See* 29 C.F.R. § 2560.503-1(h)(4), (h)(3)(iii)[25] (requiring plan providing disability benefits to consult with health care professional in deciding appeal of adverse benefit determination "based in whole or in part on a medical judgment"). In the event of an appeal from an initial determination based on a medical review team's finding, there would be no way for the Trustees to determine disability onset date without poring over medical records. Moreover, relying on SSA findings for a determination of *overall* disability and a medical review team's findings for *onset date* creates the possibility of conflict—the medical review team might disagree with the SSA's findings and conclude that there is *no onset date at all*. When considering that the determination of disability and disability onset date are inextricably linked, it would be

---

[25] The Department of Labor has clarified this regulation:

A benefit is a disability benefit under the regulation, subject to the special rules for disability claims, if the plan conditions its availability to the claimant upon a showing of disability. It does not matter how the benefit is characterized by the plan or whether the plan as a whole is a pension plan or a welfare plan. If the claims adjudicator must make a determination of disability in order to decide a claim, the claim must be treated as a disability claim for purposes of the regulation. . . . ***Accordingly, plans, including pension plans, that provide benefits conditioned upon a determination of disability must maintain procedures for claims involving such benefits*** that comply with the requirements of the regulation applicable to disability claims, ***including*** the requirements for de novo review, ***the consultation requirement for medical judgments***, the limit on appeal levels, the time limits for deciding disability claims, and the disclosure requirements in connection with extensions of time.

***However, if a plan provides a benefit the availability of which is conditioned on a finding of disability, and that finding is made by a party other than the plan for purposes other than making a benefit determination under the plan, then the special rules for disability claims need not be applied to a claim for such benefits.*** For example, if a pension plan provides that pension benefits shall be paid to a person who has been determined to be disabled by the Social Security Administration or under the employer's long term disability plan, a claim for pension benefits based on the prior determination that the claimant is disabled would be subject to the regulation's procedural rules for pension claims, not disability claims.

Department of Labor, FAQs About the Benefit Claims Procedure Regulation, http://www.dol.gov/ebsa/faqs/faq_claims_proc_reg.html (last visited Mar. 31, 2015) (emphasis added).

extremely difficult and highly inefficient for the Trustees to parse the analysis in such a way that the medical review team would only decide onset date. Clearly, the plan's reliance on SSA disability determinations is an effort to avoid these consequences, which would ultimately lead to increased costs in administering the plan and additional harm to plan participants as a whole.

Notwithstanding the logical and reasonable nature of the Trustees' interpretation, Plaintiff points out that any mention of reliance on the SSA's onset date finding is absent from the plan. Yet, also absent from the plan is any provision requiring the Trustees to independently determine disability onset date rather than simply relying on the SSA's findings. The only mention of how disability will be determined under the plan explains that the plan uses SSA findings to decide whether an applicant is disabled. The Trustees reasonably contended that implicit within the plan's reliance on the SSA's ultimate finding of disability is the plan's use of the disability onset date determined by the SSA as the starting point under the 1000-hour provision. This holistic reading of the plan is most harmonious with the Trustees' decision to rely on the SSA's disability determination findings, in turn preventing the Trustees from having to conduct a costly independent evaluation of onset date that would be exceedingly difficult to administer. Accordingly, the undersigned finds that the plan language (or *Booth* factor one) favors the Trustees' decision denying benefits as Plaintiff had not worked any hours in the two years prior to the disability onset date found by the SSA (April 2006).[26] (D0005, D0100).

---

[26] In *Howington v. Smurfit-Stone Container Corp.*, the plan at issue similarly required a participant to qualify for DIB before receiving a disability pension and stated that an employee must have been employed at the date of disability onset to earn a disability pension. No. 11-0136-KD-M, 2012 WL 443843, at *7 (S.D. Ala. Feb. 13, 2012).The plan also failed to explicitly establish that the SSA's date of onset finding would be used by the plan administrator in determining the date of disability onset for purposes of the plan. *Id.* The plaintiff in that case was denied a disability pension as his last date of work was in September 2007 and the SSA found that his date of onset occurred in October 2007, apparently based on the plaintiff's mistaken report to the SSA that he had worked in October 2007. *Id.* at *1-*2. The plaintiff attempted to have the

The second *Booth* factor, "the purposes and goals of the plan," also favors the Trustees' decision. 201 F.3d at 342. While the 2006 SPD states that the plan "represents important protection for" participants and their families, (D1224), the Trustees also have an important interest in "ensuring that funds which are not unlimited go to those who, according to the terms of the plan, are truly deserving." *Evans*, 514 F.3d at 323. The specific purpose of relying on the SSA for disability determinations is for the Trustees to save costs in administering the plan. Relying on SSA onset date findings furthers that purpose. Moreover, while the plan does evidence a goal to aid those who are disabled, clearly that goal does not require the Trustees to approve disability pension benefits for every disabled participant in the plan regardless of whether the participant meets the requirements for a disability pension under the plan. The SSA found that Plaintiff was

---

onset date amended by the SSA, but he requested the amendment too late. *Id.* at *2. The plaintiff then brought suit against the defendants who administered the plan, and the defendants requested summary judgment. *Id.* at *1. In its analysis, the court noted that the plan language did not require the plan administrator to adopt the SSA's date of onset finding, and that, but for the plaintiff's mistaken belief as to when he last worked, he would have been eligible for a disability pension. *Id.* at *7. In initially denying the defendants' motion for summary judgment, the court found "that it would be arbitrary and capricious to refuse to consider the underlying medical records to support the disability onset date." *Id.* at *8. Furthermore, the court found that an issue of fact remained as to the plaintiff's credibility, which precluded summary judgment. *Id.* Later finding that the plaintiff was credible after a bench trial, the court remanded to the defendants for a new decision on the plaintiff's disability pension application. 856 F. Supp. 2d 1235, 1243-44 (S.D. Ala. 2012). The court acknowledged that the defendants' reliance on the SSA's onset date finding "may be reasonable," but nonetheless found that the defendants breached their fiduciary duty to the plaintiff by failing to consider whether the onset date was based on a "clerical mistake." *Id.* On remand, the defendants again denied the plaintiff's application. 2013 WL 5446188, at *3 (S.D. Ala. Sept. 30, 2013). The court then permitted the plaintiff to reopen the case. *Id.* The defendants again requested summary judgment and explained that they did not have a "medical staff to evaluate [the] medical records," submitted by the plaintiff. *Id.* at *7. The defendants acknowledged that the court had ordered them to conduct an investigation into the plaintiff's claim of clerical error, but held firm that they refused to "process claims in that manner." *Id.* As a secondary position, the defendants pointed to evidence that supported an onset date of October 2007 rather than September 2007. *Id.* The court found that "although [defendant] ha[d] failed in its fiduciary duty to administratively consider whether the onset date was a clerical error, [defendant] ha[d] pointed to reasonable grounds in its summary judgment motion to support the denial of benefits." *Id.* (markings and footnote omitted). Based on that ground, the court granted summary judgment to the defendants, *id.* at *8, and the Eleventh Circuit affirmed. 564 F. App'x 537, 538 (11th Cir. 2014). Because Plaintiff is not arguing that a clerical error is the reason for his denial of disability pension benefits, the undersigned finds *Howington* to be distinguishable. To the extent that the undersigned's analysis of the issues in this case conflicts with *Howington*, the undersigned finds that the reasoning in *Howington* is unpersuasive and undermines a plan administrator's discretion and a plan's holistic policy to rely on the SSA's findings. Moreover, the court in *Howington* acknowledged that reliance on the SSA's onset date finding, even when such reliance is not explicitly required by the plan language, "may be reasonable." 856 F. Supp. 2d at 1243.

only disabled as of April 2006, and as such, the Trustees found that Plaintiff was not entitled to a disability pension. Granting Plaintiff disability pension benefits when he does not meet the requirements for a disability pension does not further the goals of the plan. *See O'Dell v. Coal Co. Employees' Comprehensive Plan & Benefits Comm.*, No. 2:05-CV-00040, 2006 WL 3522681, at *13 (S.D.W.Va. Dec. 6, 2006) (recognizing that goal of plan to protect employees was served where employee met requirements for benefits under plan and that prerequisites to obtaining benefits were put in place to ensure "financial integrity" of the plan, which allows plan to reach goal for deserving employees).

The third *Booth* factor, "the adequacy of the materials considered to make the decision and the degree to which they support it," also bolsters the Trustees' decision. 201 F.3d at 342; *see also Clark*, 933 F. Supp. 2d at 880 (considering whether plan administrator's decision was supported by substantial evidence under third *Booth* factor). The plan requires the Trustees to consider the SSA's findings as to whether an applicant is disabled. As discussed above, a logical interpretation of the plan also requires the Trustees to rely on the SSA's finding as to an applicant's onset of disability date. In deciding whether Plaintiff qualified for a disability pension, the Trustees noted that Plaintiff submitted "a detailed memorandum, medical records and evidence of his work history." (D0296). However, from the Trustees' decision, it appears that the Trustees considered Plaintiff's work history, the language of the plan,[27] and the SSA's findings. (D0298). Those materials were adequate for the Trustees to decide Plaintiff's eligibility, and they support the Trustees' decision.

---

[27] As noted above, in the appeal denial letter, the Trustees did not make clear what version of the plan was used in determining Plaintiff's application for benefits. The language of the denial letter demonstrates that the Trustees used either the amended 2003 plan or 2010 plan.

Furthermore, the Trustees were not required by the plan to consider the medical records and ICO records submitted by Plaintiff. In support of his argument that the Trustees should have considered the records that he submitted and should not have solely relied on the SSA's disability determination, Plaintiff cites *Lester v. United Mine Workers Health & Retirement Fund*, 40 F. Supp. 2d 800 (S.D.W.Va. 1999) (Goodwin, J.). (ECF No. 30 at 29-30; ECF No. 34 at 6). In *Lester*, the defendant trustees denied the plaintiff participant's application for disability benefits under a pension plan. *Lester*, 40 F. Supp. 2d at 801-02. In order for a participant to obtain disability benefits, the plan required, in part, that the participant become "totally disabled as a result of a mine accident." *Id.* at 802. "Totally disabled" meant that the accident caused the participant to become eligible for DIB from the SSA. *Id.* The plaintiff applied for DIB in August 1992, after experiencing mine accidents in 1986 and 1987, alleging an onset date of July 1991, when he stopped working. *Id.* at 802, 805. His application for DIB was denied in September 1994, and that decision was later upheld by a federal court. *Id.* at 805-06. The plaintiff again applied for DIB in June 1997, and an ALJ granted the plaintiff's application with an onset date finding of August 1994. *Id.* at 806. The plaintiff's application for disability benefits was denied by the defendants because they found that he had not established a causal link between his disability and two prior mine accidents. *Id.* at 806. On appeal of that decision to this Court, Judge Goodwin found that the defendants had abused their discretion by relying "solely on the lapse of time between the plaintiff's mine accident and a Social Security disability determination to support their conclusion that the plaintiff's disability was not caused by a mine accident." *Id.* at 807. After examining the medical evidence supporting a causal link between the two mine accidents that plaintiff suffered and his SSA award, and recognizing that defendants supplied no support for their "alternative

theory of disability," Judge Goodwin ordered that the defendants grant the plaintiff disability pension benefits. *Id.* at 807-09. While Plaintiff claims that *Lester* is indistinguishable from the facts of this case, he is incorrect. In *Lester*, the plan language imposed the responsibility on the trustees to determine the cause of a participant's disability, and the trustees did not argue that they would not consider medical evidence submitted by participants in arriving at their decision. Judge Goodwin overturned the trustees' decision denying disability benefits because they failed to consider medical evidence that they were required to consider under the language of the plan. Here, there is no plan language requiring the Trustees to independently determine the onset date of disability, and they have asserted that they do not consider anything other than the SSA's findings in determining whether an applicant is eligible for a disability pension. In other words, it appears that a mechanism for reviewing causation claims was in place under the terms of the plan in *Lester* whereas, in this case, the Trustees have no independent obligation to determine disability onset date under the language of the plan and, consequently, no established procedure for doing so. Moreover, *Lester* does not discuss the issue of disability onset date determination under a plan with language similar to the plan in this case. Accordingly, *Lester* is distinguishable from the facts of this case.[28]

Plaintiff also argues that his position finds support in *Osborne v. Trustees of UMWA Health & Retirement Funds*, 953 F.2d 1383, 1992 WL 17303 (4th Cir. Feb. 5, 1992) (unpublished table decision). (ECF No. 30 at 31; ECF No. 34 at 6). Specifically,

---

[28] In *Evans v. Metropolitan Life Ins. Co.*, an ERISA case, the Fourth Circuit held that the defendant insurance company abused its discretion where it failed to consider medical evidence submitted by the plaintiff applicant which demonstrated that he was totally disabled as of a certain date that would have, in turn, made him eligible for disability benefits under his employer's group insurance plan terms. 358 F.3d 307, 309, 312 (4th Cir. 2004). *Evans* is distinguishable from this case as the plan in *Evans* required the defendant to consider medical evidence in determining whether an applicant was disabled under the plan while the plan in this case requires the Trustees only to consider the SSA's findings. *Id.* at 311-12.

Plaintiff cites *Osborne* for the proposition that an SSA onset date finding is not "dispositive" in a claim for disability pension benefits, and therefore, the Trustees should have considered the additional evidence that he submitted. (ECF No. 30 at 31); *Osborne*, 1992 WL 17303, at *2. Similar to *Lester*, *Osborne* considered a plan that required the defendant trustees to determine the cause of a participant's disability. *Osborne,* 1992 WL 17303, at *1. The differences in plan language and trustee responsibility distinguish *Osborne* from this case.[29] Overall, the Trustees' decision is supported by substantial evidence.

Turning to the fourth *Booth* factor, "whether the fiduciary's interpretation was consistent with other provisions in the plan and with earlier interpretations of the plan," the undersigned finds this factor supports the Trustees' decision. 201 F.3d at 342. Plaintiff argues that the Trustees' interpretation of the plan is inconsistent with the provision for determining disability pension amount (as opposed to eligibility). In particular, he asserts that the plan's discussion of disability pension amount recognizes that "the SSA date of onset may very well be different from the pension disability date of onset." (ECF No. 30 at 24). By way of background, the plan states that payment of a disability pension commences the month after an application for disability benefits is filed by a participant, assuming the participant meets all of the requirements. (D1178,

---

[29] The undersigned also notes that, with regard to the third *Booth* factor, while it is not clear that the Trustees considered the 2006 SPD in their decision, the 2006 SPD explicitly states that "the date of onset of disability is also governed by [the participant's] Social Security award," and that "[t]he Plan does NOT do its own medical evaluations nor provide benefits for occupational or other disability that does not satisfy Social Security standards for total and permanent disability." (D1247). However, statements in an SPD "do not themselves constitute the terms of the plan." *Cigna Corp. v. Amara*, ____ U.S. ____, 131 S.Ct. 1866, 1878, 179 L.Ed.2d 843 (2011). The Fourth Circuit has mentioned that the Supreme Court's decision in *Amara* "cast serious doubt" as to whether courts may use non-plan documents to interpret a plan's language. *Cosey v. Prudential Ins. Co. of Am.*, 735 F.3d 161, 170 n.8 (4th Cir. 2013). *But see Shoop v. Life Ins. Co. of Am.*, 839 F. Supp. 2d 830, 837 (E.D. Va. 2011) (stating that court may use SPD to decide what terms of plan meant on *de novo* review); *Lamb v. Nextel Commc'ns of Mid-Atlantic, Inc.*, No. 4:09cv149, 2010 WL 4068250 (E.D. Va. Aug. 19, 2010), report and recommendation adopted by 2010 WL 4068483 (E.D. Va. Oct. 13, 2010) (noting that the SPD may serve to clarify plan language and aid the Trustees' in rendering their decision).

D1343). Of course, situations may arise where there is a significant delay between the filing of an application and meeting the disability requirements under the plan. In that case, the participant is entitled to a retroactive amount of disability benefits. (D1178, D1343). Plaintiff highlights the retroactive amount calculation provision, which states:

> The retroactive amount equals the disability pension monthly benefit amount times the number of months between the later of the first date for which Social Security disability benefits are payable or the first day of the month following the month in which the Participant last worked in Covered Employment (other than for purposes of rehabilitation).

(D1178, D1343).[30] Plaintiff argues that this provision evidences that the pension disability onset date may be at the time the participant last worked rather than the date found by the SSA. (ECF No. 30 at 25). Otherwise, according to Plaintiff's contention, the plan would assume that a participant was able to work after being found disabled by the SSA. (*Id.*) While Plaintiff's argument may seem clever at first blush, there are situations where the provision is not rendered illogical under the Trustees' interpretation of the disability pension eligibility terms. For example, a participant could attempt to return to work a few weeks after being injured, but stop working after a short period of time, e.g. a matter of hours. In that situation, the SSA could determine that the work performed after the injury was not substantial gainful activity, and therefore, the participant should be entitled to DIB preceding the date he or she last worked. Under such a scenario, DIB could potentially be awarded prior to the last work performed in Covered Employment. As such, Plaintiff's position that the retroactive calculation provision conflicts with the Trustees' interpretation of the plan is unconvincing. Furthermore, the undersigned finds that the Trustees' interpretation of the plan is consistent with the provisions of the plan

---

[30] The undersigned notes that this provision would not have benefitted Plaintiff in this case. The SSA's determination of his eligibility for benefits was later than the date when he last worked, which would result in a lower retroactive benefit amount.

relying on SSA disability determinations. Additionally, Plaintiff has not pointed to any evidence demonstrating that the Trustees' interpretation of the plan was inconsistent with earlier interpretations of the plan.[31]

The fifth *Booth* factor asks "whether the decisionmaking process was reasoned and principled." 201 F.3d at 342. Here, the review process used by Mr. Meyers and the Trustees was both. Mr. Meyers and the Trustees applied the pertinent plan language to the relevant evidence contained in Plaintiff's administrative file at both stages of the review process. Plaintiff discussed the 1000-hour requirement with Mr. Meyers at length over the telephone before Mr. Meyers issued the initial denial letter. (ECF No. 30 at 9). Mr. Meyers also indicated in his denial letter that he had reviewed Plaintiff's written submissions regarding his application. (D0194). Plaintiff was subsequently permitted to submit a written explanation of his position and supporting evidence on the issue to the Trustees on appeal. However, during the decisionmaking process, Mr. Meyers and the Trustees were not required to adopt Plaintiff's view or analyze evidence that was impertinent to his application. Having rejected Plaintiff's argument as to the 1000-hour requirement, both Mr. Meyers and the Trustees explained Plaintiff's avenues for further recourse, if he chose to pursue them. (D0194-95, D0298-99). After reviewing the administrative record, the undersigned finds that the decisionmaking process was reasoned and principled. *See Lovejoy v. Am. Elec. Power Long-Term Disability Plan*, No. 2:10-cv-01386, 2012 WL 383661, at *10 (S.D.W.Va. Feb. 3, 2012) (considering adequacy of notifications and ability to submit additional evidence on appeal in determining whether decisionmaking process was reasoned and principled).

---

[31] While the 1999 SPD did not contain the explicit onset date language contained in the 2006 SPD, the 1999 SPD nevertheless makes clear that the Trustees rely on SSA determinations in deciding whether an applicant qualifies for a disability pension. (D1019).

With regard to the sixth *Booth* factor, "whether the decision was consistent with the procedural and substantive requirements of ERISA," Plaintiff contends that the Trustees' decision is inconsistent with ERISA because the 1999 SPD does not explicitly declare that the SSA's finding as to disability onset date will be dispositive for the purposes of disability pensions under the plan. (ECF No. 30 at 22-23); 201 F.3d at 342. According to Plaintiff, this violates ERISA's requirement that an SPD state "the circumstances which may result in disqualification, ineligibility, or denial or loss of benefits." 29 U.S.C. § 1022(b). He further argues that the initial denial and appeal denial letters did not provide him with adequate notice of the reasons for denying his claim contrary to 29 C.F.R. § 2560.503-1(g)(1)(i) and (j)(1).

Plaintiff's first attack on the Trustees' decision does not actually relate to the consistency of their decision with the procedural or substantive requirements of ERISA; instead, his argument relates to an ERISA requirement concerning the contents of SPDs. Nevertheless, even assuming that Plaintiff's argument is relevant to the issue, his position is unpersuasive. First, both the 1999 SPD[32] and 2006 SPD provide the terms under which a participant becomes eligible for a disability pension. (D1019, D1247). A rational reading of the 1999 SPD would lead a reasonable person in Plaintiff's circumstances to the conclusion that he is not eligible for a disability pension as a result of the Trustees' reliance on SSA disability determinations. Moreover, both the 1999 SPD and the 2006 SPD also state the terms of disqualification, ineligibility, or loss of benefits, e.g. if a person is no longer considered disabled by the SSA. (D1032, D1248). Plaintiff has failed to cite any authority that every contingency that may arise in determining eligibility for benefits under the plan must be included in the SPD; on the contrary, that is precisely

---

[32] The 1999 SPD has little relevance to the Trustees' decision.

why trustee discretion exists.

Turning to Plaintiff's second contention, the denial letters at both the initial determination level and appeal level were sufficient. The regulations addressing the issue require that a plan administrator provide in the initial denial letter and appeal denial letter the specific reason for denial and "reference to the specific plan provisions" on which the denial is based. 29 C.F.R. § 2560.503-1(g)(1)(i)-(ii), (j)(1)-(2). Both denial letters stated the reasons for denial and cited the specific plan provision on which the denial was based. (D0194, D0298). The appeal denial letter also explicitly informed Plaintiff that the Trustees used the onset date determined by the SSA in accordance with the language of the plan. (D0298). While both letters ideally could have further explained *why* the SSA's onset date was used in determining eligibility under the plan, the undersigned does not find that the explanations in the letters are so deficient as to run afoul of the regulations. Accordingly, Plaintiff's arguments that the Trustees' decision is inconsistent with the requirements of ERISA are unavailing.

Plaintiff also argues that the Trustees' decision is inconsistent with federal law in general. (ECF No. 30 at 33-34). He insists that the Trustees' interpretation of the plan required him to work when he was disabled, and thus, created an impossible standard for him to meet. However, Plaintiff had not been found disabled by the SSA in 2004 and 2005, when he would have been required to work in order to obtain a disability pension under the plan. To the extent that Plaintiff was declared disabled by the ICO, the plan does not rely on the findings of the ICO in determining disability, and it is widely accepted that workers' compensation findings by state agencies are not binding on the SSA. *See, e.g., Luck v. Comm'r of Soc. Sec.*, No. 3:13 CV 687, 2014 WL 1383315, at *9 (N.D. Ohio Apr. 9, 2014). Furthermore, the ICO determined that Plaintiff was entitled to

"permanent total disability compensation" only as of February 12, 2007. (D0089-90).

In addition, Plaintiff appears to contend that the Trustees' interpretation of the plan conflicts with the Family Medical Leave Act ("FMLA"), 29 U.S.C. § 2601 *et seq.* (ECF No. 30 at 34). However, Plaintiff does not assert that he ever requested leave under the FMLA, and the FMLA limits the amount of leave that may be taken within a single year. 29 U.S.C. §§ 2611(2)(A), 2612(1). Moreover, the plan contemplates and allows for leave under the FMLA, but again, Plaintiff has not claimed that he ever requested leave pursuant to the FMLA. (D1081, D1322). Accordingly, Plaintiff's argument that the Trustees' interpretation of the plan is contrary to federal law is unconvincing.

The last factor meriting discussion is the eighth *Booth* factor, which relates to whether the Trustees were operating under a conflict of interest. 201 F.3d at 343. The Trustees here are composed of representatives from participating unions and employers, and they "generally serve without pay." (D1228, D1276). As discussed above, the plan provides the Trustees with the discretion to determine benefit eligibility. (D1128-29, D1375). Under similar facts, where a pension fund has been "governed by a board of trustees that includes representatives from participating unions and employers," and the board of trustees has been granted discretionary authority "as independent fiduciaries to determine benefit eligibility," this Court has previously found that no conflict of interest exists. *Robertson v. Nat'l Asbestos Workers Pension Fund*, No. 3:10-1092, 2011 WL 672057, at *4 n.2 (S.D.W.Va. Feb. 14, 2011) (Chambers, J.). Plaintiff has not argued that a conflict of interest exists, and no such conflict is apparent from the record.

In sum, the *Booth* factors support the Trustees' decision denying Plaintiff's application for disability pension benefits. The Trustees arrived at their decision using a deliberate, principled reasoning process, and their decision is supported by substantial

evidence. *See Evans*, 514 F.3d at 322. The Trustees' interpretation of the plan and ultimate decision are reasonable, and therefore, the undersigned finds that the Trustees did not abuse their discretion in denying Plaintiff's application for benefits. *See Bernstein*, 70 F.3d at 787.

For the aforementioned reasons, the undersigned **RECOMMENDS** that the District Court **FIND** that Defendants did not abuse their discretion in denying Plaintiff's application for disability pension benefits. The undersigned further **RECOMMENDS** that the District Court **GRANT** Defendants' motion for summary judgment on Plaintiff's benefits claim and **DENY** Plaintiff's motion for summary judgment on his benefits claim.

### B. Breach of Fiduciary Duty

Plaintiff alleges that Defendants breached their fiduciary duty in four ways: (1) they failed to produce all relevant information and documents that he requested from them; (2) they arbitrarily and capriciously or abused their discretion by denying him disability pension benefits; (3) they neglected to treat his claim for a disability pension reasonably and fairly; and (4) they failed to conduct "a full and fair review" of his claim. (ECF No. 30 at 21-24). In response, Defendants argue that Plaintiff's breach of fiduciary duty claim merely restates his claim for disability pension benefits and his claim for failure to produce documents. (ECF No. 32 at 12-13). Defendants insist that this type of "catch-all" fiduciary duty claim is inappropriate under ERISA, and therefore, Plaintiff's breach of fiduciary duty claim must be dismissed.[33] (*Id.*) Plaintiff responds that he has "alleged multiple breaches by the fiduciary under ERISA that do not . . . rest upon an

---

[33] In support of their position, Defendants cite a case referencing 29 U.S.C. § 1132(a)(2). (ECF No. 32 at 13). However, Plaintiff has brought his breach of fiduciary duty claim under 29 U.S.C. § 1132(a)(3). (ECF No. 3 at 22). Under § 1132(a)(2), Plaintiff's claim would fail for a different reason--§ 1132(a)(2) only permits recovery "on behalf of the plan," and does not allow a plaintiff to recover "personal damages for misconduct." *David v. Alphin*, 704 F.3d 327, 332 (4th Cir. 2013).

interpretation and application of the plan." (ECF No. 34 at 14). For example, Plaintiff argues that he has pled distinct claims for the Trustees' failure to consider all of the evidence that he submitted to them and that Defendants failed to set forth specific reasons for denying his application in their denial letters. (*Id.*) Moreover, Plaintiff alleges that Mr. Meyers breached his fiduciary duty by providing him with inconsistent information and by "losing" information that Plaintiff submitted to him. (*Id.* at 15).

Under ERISA, a participant, beneficiary, or fiduciary may be bring an action for breach of fiduciary duty "to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this subchapter or the terms of the plan." 29 U.S.C. § 1132(a)(3); *see also Griggs v. E.I. DuPont de Nemours & Co.*, 237 F.3d 371, 384 (4th Cir. 2001) (citing *Varity Corp. v. Howe*, 516 U.S. 489, 407-15, 116 S.Ct. 1065, 134 L.Ed.2d 130 (1996)). "By this provision, Congress provided individual beneficiaries with an avenue to seek equitable relief for a breach of fiduciary duty under ERISA." *Griggs*, 237 F.3d at 384. "The phrase 'other appropriate equitable relief' encompasses 'those categories of relief that were typically available in equity (such as injunction, mandamus, and restitution, but not compensatory damages).'" *Id.* (quoting *Mertens v. Hewitt Assocs.*, 508 U.S. 248, 256, 113 S.Ct. 2063, 124 L.Ed.2d 161 (1993)). However, even if of equitable nature, "relief is not 'appropriate' ... 'where Congress elsewhere provided adequate relief for a beneficiary's injury' and there is 'no need for further equitable relief.'" *Id.* (quoting *Varity*, 516 U.S. at 515).

Congress has provided adequate relief for Plaintiff's alleged injuries which he claims resulted from Defendants' purported breach of fiduciary duty. With regard to Plaintiff's failure to produce documents claim, Congress has specifically authorized

penalties against plan administrators for failure to produce certain documents upon a participant's request. 29 U.S.C. § 1024(b)(4); 29 U.S.C. § 1132(c)(1). Thus, supplementary forms of equitable relief are not "appropriate" under § 1132(a)(3). *See Griggs*, 237 F.3d at 384; *Piner v. E.I. DuPont De Nemours & Co.*, 238 F.3d 414, 2000 WL 1699837, at *4 (4th Cir. Nov. 14, 2000) (unpublished table decision) (recognizing that § 1132(c)(1) is "exclusive remedy for an administrator's failure or refusal to comply with" document requests); *Wallace v. Freight Drivers & Helpers Local Union No. 557 Pension Fund*, No. 1:11-cv-02062-JKB, 2012 WL 1327921, at *7 (D. Md. Apr. 16, 2012) (recognizing that § 1132(c)(1) provides "adequate" and "specifically tailored" remedy for plan administrator's failure to produce documents upon request); *Schlenger v. Fidelity Employer Servs. Co., LLC*, 785 F. Supp. 2d 317, 337 (S.D.N.Y. 2011) (finding that additional equitable relief requested for failure to provide documents was not "appropriate" given that Congress provided participants with remedy under § 1132(c)(1)); *Harju v. Olson*, 709 F. Supp. 2d 699, 724 (D. Minn. 2010) ("Defendants are entitled to summary judgment on plaintiffs' claim for breach of fiduciary duty for failure to produce plan documents because ERISA elsewhere provides adequate relief for the injuries related to those actions."). Moreover, within the Fourth Circuit, there is no "general fiduciary obligation under ERISA to provide information related to the plan on request," outside of that contained in § 1024(b)(4). *Faircloth v. Lundy Packing Co.*, 91 F.3d 648, 657-58 (4th Cir. 1996).

In addition, Congress has provided an adequate remedy for the remainder of Plaintiff's breach of fiduciary duty claims under § 1132(a)(1)(B), which permits a participant or beneficiary to bring an action to recover benefits due to him under the terms of the plan. "[I]t is well settled that where a Plaintiff has available to [him] other adequate relief under ERISA, such as a claim for benefits under [29 U.S.C. §

42

1132(a)(1)(B)], a breach of fiduciary duty claim brought under [29 U.S.C. § 1132(a)(3)] is duplicative and must be dismissed." *Doss v. Hartford Life Ins. Co.*, No. 3:05CV386-C, 2005 WL 3864114, at *2 (W.D.N.C. Dec. 21, 2005) (collecting cases), report and recommendation adopted by 2006 WL 695022 (W.D.N.C. Mar 12, 2006); *see also Korotynska v. Metropolitan Life Ins. Co.*, 474 F.3d 101, 105-06 (4th Cir. 2006) (recognizing that breach of fiduciary duty claim was inappropriate under § 1132(a)(3) where plaintiff's injury was redressable through claim for benefits under § 1132(a)(1)(B)); *Tingler v. Unum Life Ins. Co.*, No. 6:02-1285, 2003 WL 1746202, at *4 (S.D.W.Va. Apr. 2, 2003) ("[W]here a participant is provided adequate relief by the right to bring a claim for benefits under [§ 1132(a)(1)(B)], the plaintiff does not have a cause of action to seek the same remedy in a breach of fiduciary duty claim under [§ 1132(a)(3)]"). Indeed, as the remedy for Defendants' purported breaches of fiduciary duty, Plaintiff requests that the Court order that he is entitled to benefits. (ECF No. 3 at 22). Because the balance of Plaintiff's breach of fiduciary duty allegations relate to the sufficiency of Defendants' review of his claim for benefits, and Plaintiff has an adequate remedy under § 1132(a)(1)(B) for those allegations, additional equitable relief is not "appropriate" under the catch-all provision of § 1132(a)(3).[34] (ECF No. 30 at 21-24). To the extent that Plaintiff maintains that his claims fall within § 1132(a)(3) because they are not related to "an interpretation or application of the plan," his argument is unavailing. (ECF No. 34 at 14). As set forth above, the § 1132(a)(3) analysis focuses on the adequacy of the relief available to the plaintiff, and in this case, Plaintiff has available to him an adequate remedy under §

---

[34] An adequate remedy should not be confused with a successfully obtained remedy. *See, e.g., Ogden v. Blue Bell Creameries U.S.A., Inc.*, 348 F.3d 1284, 1287 (11th Cir. 2003) ("[T]he availability of relief under [§ 1132(a)(3)] [is] in no way dependent on the success or failure of the [§ 1132(a)(1)(B)] claim because the availability of an adequate remedy . . . does not mean, nor does it guarantee, an adjudication in one's favor.") (markings omitted).

43

1132(a)(1)(B).[35] Accordingly, Plaintiff's claim for breach of fiduciary duty must be dismissed.

For the aforementioned reasons, the undersigned **RECOMMENDS** that the District Court **FIND** that there is no genuine issue of material fact as to Plaintiff's breach of fiduciary duty claim. The undersigned further **RECOMMENDS** that the District Court **GRANT** Defendants' motion for summary judgment on Plaintiff's breach of fiduciary duty claim and **DENY** Plaintiff's motion for summary judgment on his breach of fiduciary duty claim.

### C. Failure to Produce Documents

Plaintiff claims that he is entitled to a statutory penalty under ERISA based on Defendants' failure to produce certain documents upon request. (ECF No. 3 at 24-28). Specifically, Plaintiff alleges that Defendants' failed to provide him with: (1) a copy of the plan in effect as of December 2002; (2) a copy of the most recent Form 5500; (3) "all relevant documents, records and information that has been relied upon, submitted, considered or generated in the course of making Plaintiff's benefit determination"; and (4) all amendments to the plan and SPD since December 2002. (*Id.* at 27-28). In response, Defendants argue that all documents required to be produced under 29 U.S.C. 1024(b)(4) were provided to Plaintiff. (ECF No. 32 at 13). Moreover, Defendants insist that a penalty for failure to provide a prior plan version or out-of-date SPD is inappropriate in this circuit. (*Id.* at 14). Lastly, Defendants contend that Plaintiff has suffered no prejudice from any failure to or delay in providing documents. (*Id.*)

As stated above, on June 3, 2013, Plaintiff faxed a letter to Mr. Meyers requesting "complete copies . . . of any and all documents governing the operation of the plan that

---

[35] Furthermore, to the extent that Plaintiff raises a claim of estoppel, that claim is discussed below.

may be used, referred to, considered or control any decision with respect to [Plaintiff's] application for disability retirement filed on March 5, 2008." (D0198). More specifically, Plaintiff asked that he be provided "all documents, records, and other information that is relevant and has been used to consider [his] claim with a complete copy of [his] application filed on March 5, 2008." (D0198). On June 18, 2013, Plaintiff faxed another letter to Mr. Meyers, this time requesting "a complete copy of [his] claim file," copies of all "Plan documents filed with the Department of Labor including the Plan's Form 5500," and copies of the pension plan and SPD that were in effect in December 2002 along with copies of any subsequent amendments. (D0210). Mr. Meyers responded by letter to Plaintiff's requests on June 20, 2013, and attached to his letter copies of the 1999 SPD, the 2003 pension plan, Plaintiff's contribution details report, Plaintiff's March 5, 2008 application, and the SSA award letter. (D0212; ECF No. 30 at 13). On July 24, 2013, Mr. Meyers sent additional documents to Plaintiff, including copies of the 2011 Form 5500, the current SPD, and Plaintiff's complete administrative file. (D0295).

Under ERISA, a plan administrator must "upon written request of any participant or beneficiary, furnish a copy of the latest updated summary[] plan description, and the latest annual report, any terminal report, the bargaining agreement, trust agreement, contract, or other instruments under which the plan is established or operated."[36] 29 U.S.C. § 1024(b)(4) (footnote omitted). "[T]he written notice must give the plan administrator clear notice of the information the plan participant seeks." *Middlebrooks v. St. Coletta of Greater Wash., Inc.*, No. 1:10cv653, 2010 WL 3521760, at *3 (E.D. Va. Sept. 7, 2010) (citing *Faircloth*, 91 F.3d at 655). "Failure to comply with such a request within

---

[36] The Fourth Circuit has declared that the "other instruments" language in the statute "encompasses formal or legal documents under which a plan is set up or managed." *Faircloth v. Lundy Packing Co.*, 91 F.3d 648, 653 (4th Cir. 1996).

30 days may, in the court's discretion, be punished by sanctions of up to $110 per day of delay." *Chaffin*, 703 F. Supp. 2d at 594 & n.7 (citing 29 U.S.C. § 1132(c)(1) and 29 C.F.R. § 2575.502c–1)) (footnote omitted). "[E]ach violation . . . shall be treated as a separate violation." 29 U.S.C. 1132(c)(1). In determining the amount of a document penalty, a district court may consider any prejudice to the requesting party and any bad faith by the plan administrator. *Id.* at 595; *see also Mullins v. AT & T Corp.*, 424 F. App'x 217, 225 (4th Cir. 2011) (recognizing that two factors guide district court's discretion in determining whether to impose document penalty: prejudice to plaintiff and "the nature of the administrator's conduct") (markings omitted). A court may also consider "frustration, trouble, and expense . . . in deciding whether to impose a penalty." *Davis v. Featherstone*, 97 F.3d 734, 738 (4th Cir. 1996).

Beginning with Plaintiff's request for a copy of the plan in effect as of December 2002, Defendants do not dispute that Plaintiff was not sent a copy of the 1999 plan, which was in effect in December 2002. (ECF No. 32 at 13-14). However, they argue that a penalty for failure to produce an outdated plan document is inappropriate. (*Id.* at 14). The undersigned finds Defendants' position to be persuasive. The Fourth Circuit has rejected arguments that ERISA's document production provision should be construed broadly. *Faircloth*, 91 F.3d at 653-54; *see also Colin v. Marconi Commerce Sys. Employees' Retirement Plan*, 335 F. Supp. 2d 590, 612 (M.D.N.C. 2004). Other federal courts have declined to impose a document penalty where a plan administrator has failed to produce a past version of an SPD or an outdated version of a pension plan if that SPD or plan was inapplicable to the participant's application. *See Fischer v. Carpenters Pension & Annuity Fund of Philadelphia & Vicinity*, No. 10-3048, 2011 WL 3438091, at *6 (E.D. Pa. Aug. 5, 2011) (collecting cases); *Jackson v. E.J. Brach Corp.*, 937 F. Supp. 735, 739 (N.D. Ill.

1996); *cf. Hartman v. Dana Holding Corp.*, 978 F. Supp. 2d 957, 967-68 (N.D. Ind. 2013) (recognizing that Seventh Circuit has held participant is entitled to outdated plan documents under § 1024(b)(4) where those documents control participant's claim for benefits). Plaintiff has not cited any authority to the contrary. (ECF No. 30 at 42-48; ECF No. 34 at 16-19). Adhering to the Fourth Circuit's policy of narrow construction in this area, the undersigned finds that a penalty is not appropriate under 29 U.S.C. § 1024(b)(4) and 29 U.S.C. § 1132(c)(1) for Defendants' failure to provide Plaintiff with a copy of the 1999 version of the plan. This conclusion is bolstered by the fact that the 1999 plan did not apply to Plaintiff's application for benefits, notwithstanding Defendants' production of the 1999 SPD to Plaintiff after receiving his document production requests.

Turning to Plaintiff's claim in relation to the Form 5500, he admits that he was provided a copy of the 2011 Form 5500 with a July 24, 2013 letter. (ECF No. 3 at 25-26). As Plaintiff requested Defendants' most recent Form 5500 on June 18, 2013, Defendants' mailing of this document occurred six days after the 30-day limit had expired. *See* 29 U.S.C. § 1132(c)(1). However, Plaintiff's complaint only contains a claim that Defendants never produced the most recent Form 5500, not that Defendants supplied with him the 2011 Form 5500 after the statutory time limit had expired. (ECF No. 3 at 27). At the time of Plaintiff's request for documents in June 2013, it is very likely that the most recent Form 5500 completed by Defendants was the 2011 Form 5500 since a Form 5500 related to a calendar-year plan need not be filed for the previous year with the IRS until July 31 (without taking into account any extension requests). IRS, Form 5500 Corner, http://www.irs.gov/Retirement-Plans/Form-5500-Corner (last visited Mar.31, 2015). Accordingly, Defendants' 2012 Form 5500 was not due until, at the earliest, July 31, 2013. Without any evidence that Defendants completed their 2012 Form 5500 before July 31,

2013, Plaintiff is not entitled to sanctions under the document penalty provision of ERISA on this claim.

Plaintiff also requests a document penalty for Defendants' alleged failure to produce "all relevant documents, records and information that has been relied upon, submitted, considered or generated in the course of making Plaintiff's benefit determination." (ECF No. 3 at 27). While Plaintiff does not offer examples of what documents he is referring to in his complaint, he does state in his brief that Defendants should have provided him with "insurance agreements, collective bargaining agreements that applied to [his] contributory work, employer documentation of hours worked," and any trust agreement governing the Pension Fund. (ECF No. 30 at 45). First, it should be noted that Plaintiff is only entitled to document penalties for those documents required to be produced under 29 U.S.C. § 1024(b)(4). *See Giertz-Richardson v. Hartford Life & Accident Ins. Co.*, No. 8:06-cv-1874-T-24MAP, 2007 WL 1099094, at *1 (M.D. Fla. Apr. 10, 2007) (collecting cases and finding that 29 U.S.C. § 1132(c)(1) only authorizes penalties for plan administrator's failure or refusal to provide documents identified in § 1024(b)(4)). To the extent that Plaintiff's claim encompasses documents not contemplated by § 1024(b)(4), e.g. employer documentation of hours worked and all of the sixteen documents listed in his brief in support of summary judgment, with the exception of the 2010 plan, (ECF No. 30 at 45-46), he is not entitled to sanctions. Second, Defendants mailed to Plaintiff the 2003 plan on June 20, 2013, and the 2006 SPD on July 24, 2013. (D0212, D0295). Those were the only documents, other than possibly the 2010 plan, which is discussed below, that the plan administrator had "clear notice" to produce in response to Plaintiff's request. *See Middlebrooks*, 2010 WL 3521760, at *3. Defendants were never made aware that Plaintiff desired copies of insurance agreements,

collective bargaining agreements, and any trust agreement, as Plaintiff only requested copies of documents that were relevant to his application or controlled any decision with respect to his application. (D0198). Nothing in the record suggests that Defendants relied on insurance agreements, collective bargaining agreements, or any trust agreement in deciding Plaintiff's application for disability benefits. Furthermore, while the 2006 SPD was supplied six days after the 30-day statutory limit, Plaintiff has not raised a claim in his complaint regarding the belatedness of Defendants' production of that document.[37] Accordingly, Plaintiff is not entitled to sanctions for Defendants' alleged failure to produce "all relevant documents, records and information that has been relied upon, submitted, considered or generated in the course of making Plaintiff's benefit determination," (ECF No. 3 at 27), **_except_** that a genuine issue of material fact exists as to whether Defendants relied on the 2010 version of the plan in deciding Plaintiff's application. If Defendants relied on the 2010 plan, then they were required to produce the 2010 plan within 30 days of June 3, 2013. (D0198); _see Chaffin_, 703 F. Supp. 2d at 597 (finding that request for "instruments under which the plan is established or operated" included plan itself); _see also Sedlack v. Braswell Servs. Group, Inc._, 134 F.3d 219, 225-27 (4th Cir. 1998) (upholding document penalty for failure to produce plan itself). As such, both Plaintiff's and Defendants' motions for summary judgment on that narrow issue should be denied.

Finally, Plaintiff claims that Defendants failed to provide him with all amendments to the plan and SPD since December 2002. (_Id._ at 28). As stated above, it is unclear from the administrative record whether Defendants relied on the 2010 pension plan in arriving at their decision on Plaintiff's application. To the extent that Defendants may not have

---

[37] The undersigned also notes that Plaintiff admits he received a copy of the 2006 SPD with each blank pension application that he received in 2013. (ECF No. 30 at 44).

referred to the 2010 plan in deciding Plaintiff's application, the undersigned finds that Defendants were nonetheless required to produce the 2010 plan to Plaintiff after he requested a complete copy of all amendments to the plan on June 18, 2013. (D0210). Defendants have not asserted that they provided a copy of the 2010 plan to Plaintiff before filing the administrative record in this case. (ECF No. 17 at 11; ECF No. 31-2 at 4; ECF No. 32 at 13-15). Accordingly, Plaintiff is entitled to a statutory penalty amount beginning 30-days after his June 18, 2013 request, or July 19, 2013. The undersigned emphasizes that this is *not* a statutory penalty for failing to produce prior versions of the plan, but *solely* a penalty for failure to provide Plaintiff a copy of the most recent version of the plan, which is contemplated by 29 U.S.C. § 1024(b)(4) and 29 U.S.C. § 1132(c)(1). *See Chaffin*, 703 F. Supp. 2d at 597. Given that a penalty *may* be imposed under the statute for Defendants' failure to produce the 2010 plan, the Court retains discretion to determine whether a penalty need be levied at all, and if so, then the Court has the discretion to determine the amount so long as the amount does not exceed $110 per day for each day that the plan administrator failed to comply under ERISA. 29 U.S.C. § 1132(c)(1); 29 C.F.R. § 2575.502c–1; *Chaffin*, 703 F. Supp. 2d at 594 & n.7.

The Fourth Circuit has upheld document penalties of $5 per day for approximately 800 days, $20 per day for 531 days, and $25 per day for 25 months. *Mullins*, 424 F. App'x at 225-26 ($25 per day); *Sedlack*, 134 F.3d at 225-27 ($20 per day); *Shade v. Panhandle Motor Serv. Corp.* 91 F.3d 133, 1996 WL 386611, at *4 (4th Cir. July 11, 1996) (unpublished table decision) ($5 per day). In both *Mullins* and *Shade*, the Fourth Circuit upheld the penalties even in the absence of bad faith. 424 F. App'x at 226; 1996 WL 386611, at *4. The Fourth Circuit has also affirmed a total award of $2500 for a delay of approximately 60 days (about $42 per day) where there was no evidence of prejudice to

the plaintiffs and no indication of bad faith on the part of plan administrator. *Faircloth*, 91 F.3d at 651-52, 659. This Court has previously awarded a penalty of $50 per day for 362 days where the plaintiff experienced frustration and had to file a lawsuit to obtain copies of the documents to which she was entitled, but the defendant did not appear to be "acting out of a malicious disregard to Plaintiff's request." *Chaffin*, 703 F. Supp. 2d at 599.

As with penalty amounts, courts have differed in deciding the last date that a penalty should be imposed. The Fourth Circuit, in an unpublished decision, has affirmed a penalty spanning from the first day of noncompliance through the date that the ERISA suit was filed by the plaintiff. *See Shade*, 1996 WL 386611, at *4 (citing *Phillips v. Riverside, Inc.*, 796 F. Supp. 403, 411 (E.D. Ark. 1992)). However, the Fourth Circuit did not give any indication in that case that using the filing date of the ERISA suit as an outer limit was the *only* acceptable method for calculating the length of noncompliance under 29 U.S.C. § 1132(c)(1). In contrast, a federal district court in New York has stopped the penalty from running once the defendant has filed its answer. *Kascewicz v. Citibank, N.A.*, 837 F. Supp. 1312, 1324 (S.D.N.Y. 1993). Still yet, another federal district court has not stopped the penalty until the date that the document was produced to the plaintiff during discovery. *Boyadjian v. CIGNA Cos.*, 973 F. Supp. 500, 505-07 (D.N.J. 1997). Because the statute focuses on the production of documents to plan participants, the undersigned finds the position in *Boyadjian* most persuasive in this case. Accordingly, in order to effectuate the purpose of the statute, the last date that any penalty should be imposed is May 13, 2014, when Defendants filed the administrative record in this case and provided a copy of the administrative record to Plaintiff, which contains the 2010 plan. (ECF No. 26).

Returning now to the amount that should be imposed for each day of delay, while it does not appear from the record that Defendants acted in bad faith when they failed to provide Plaintiff with the 2010 plan, Defendants' failure undoubtedly frustrated Plaintiff and conceivably hindered the preparation of his appeal and the formulation of his legal theories in this case. Adding to Plaintiff's frustration, Defendants apparently never informed Plaintiff which version of the plan they were using in deciding his application, and the denial letters do not inform him of that fact. It is certainly possible that Defendants used the 2010 plan in deciding Plaintiff's application given the language contained in the denial letters, which would have made the 2010 plan all the more relevant to Plaintiff's claims. Defendants have offered no justification for failing to produce the 2010 plan to Plaintiff. Instead, they argue that Plaintiff was not prejudiced by their oversight. (ECF No. 32 at 14). While the undersigned disagrees that Plaintiff did not suffer any prejudice from not having the version of the plan that was in effect at the time that his application was *denied*, the amount of prejudice suffered by Plaintiff was minimal given the similarity of the plan language between the 2003 and 2010 versions along with the consideration that Plaintiff's claim for benefits fails under either version of the plan. *See Glocker v. W.R. Grace & Co.*, 68 F.3d 460, 1995 WL 600468, at *4 (4th Cir. Oct. 12, 1995) (unpublished table decision) (noting that plaintiff did suffer prejudice from delay in producing documents because "[s]he was unable to firmly establish her cause of action until she possessed all of the documents she had requested.").[38] Furthermore, Defendants produced other plan documents in a relatively timely manner, and they have maintained throughout this litigation that the 2003 plan version applies, which presumably would

---

[38] In *Glocker*, the Fourth Circuit noted that "[w]here prejudice consists mainly of aggravation and frustration for the requesting party, courts have awarded penalties in the range of $10 to $30 per day." 1995 WL 600468, at *3.

have made them less inclined to believe that Plaintiff was entitled to a copy of the 2010 plan. Taking these facts into consideration, the undersigned respectfully recommends that the District Court impose a penalty of $25 per day for 298 days (from July 19, 2013, when 30 days had passed from Plaintiff's June 18, 2013 request, through May 13, 2014), which totals $7450. The penalty should be paid by the Trustees, as they are the plan administrator for the purposes of ERISA. (D1072, D1314).

With regard to Plaintiff's claim that Defendants failed to provide him with all amendments to SPD since December 2002, the undersigned finds that no penalty is warranted. As stated above, a penalty for failure to produce an outdated SPD is disfavored. Furthermore, there is no evidence that Defendants failed to provide Plaintiff with the latest copy of the SPD as required by § 1024(b)(4). Therefore, Plaintiff's claim on that ground fails as matter of law.

In sum, the undersigned **RECOMMENDS** that the District Court **FIND** that there is a genuine issue of material fact as to whether Defendants relied on the 2010 plan in deciding Plaintiff's application, which would have required Defendants to produce the 2010 plan within 30 days of Plaintiff's June 3, 2013 request. The undersigned further **RECOMMENDS** that the District Court **FIND** that no genuine issue of material fact exists as to the remainder of Plaintiff's failure to produce documents claims. Accordingly, the undersigned **RECOMMENDS** that the District Court **GRANT** Defendants' motion for summary judgment as to Plaintiff's claims that Defendants failed to provide copies of the plan in effect as of December 2002, the most recent Form 5500, all SPD amendments since 2002, and "all relevant documents, records and information that has been relied upon, submitted, considered or generated in the course of making Plaintiff's benefit determination," with the exception of the 2010 plan claim discussed above. Finally, the

undersigned **RECOMMENDS** that Plaintiff's motion for summary judgment be **GRANTED** with respect to Plaintiff's claim that Defendants failed to provide copies of all plan document amendments since 2002 to the extent that the claim encompasses the 2010 version of the plan. Accordingly, the undersigned **RECOMMENDS** that the District Court **AWARD** the sum of $7450 ($25 per day for 298 days) to Plaintiff.[39]

### D. Bad Faith/Gross Negligence

Plaintiff alleges that Defendants acted in bad faith or, at least, committed gross negligence in the handling of his application for benefits. (ECF No. 3 at 29; ECF No. 30 at 40-42). Plaintiff asserts that Defendants' representatives initially attempted to deny his application based on their belief he had insufficient hours for vesting purposes. (ECF No. 3 at 29). Once Plaintiff demonstrated that he had sufficient vesting hours, Plaintiff claims that Defendants' representatives informed him that they could not find his application or accompanying documents. (*Id.*) After those documents were located, according to Plaintiff, Defendants' representatives then lost his April 2013 letter and exhibits in support of his application. (*Id.*) Eventually, Defendants' representatives found Plaintiff's April 2013 letter and exhibits after he informed them that he had confirmation of delivery for those documents from the United States Postal Service. (*Id.*) Plaintiff insists that these alleged errors evidence bad faith or gross negligence. (*Id.*) In addition, Plaintiff argues that Defendants acted in bad faith or were grossly negligent when they failed to provide Plaintiff with documents that he requested, failed to identify which version of the plan was used in deciding his application, and initially misinformed him through Mr. Meyers's

---

[39] The undersigned recognizes that the same document is at issue (the 2010 plan) in both the remaining June 3 document penalty claim and the award with regard the June 18 request, which potentially creates an additional document penalty award for only 15 additional days. However, given ERISA's command to treat each violation as "separate," some courts have imposed separate penalties for failure to timely produce the same document in response to two separate requests. *See, e.g., Latimer v. Wash. Gas Light Co.*, No. 1:11cv571, 2012 WL 2087783, at *11 & n.5 (E.D. Va. June 7, 2012) (citing 29 U.S.C. § 1132(c)(1)).

representations that he met the requirements for a disability pension. (*Id.* at 29-30). Plaintiff does not specify what remedy he seeks for Defendants' alleged bad faith or grossly negligent conduct. (*Id.* at 30).

In response, Defendants assert that Plaintiff's claims of bad faith and gross negligence fail because ERISA does not permit a cause of action for improper or untimely processing of benefit claims, and any common law or state law bad faith or gross negligence action is preempted by ERISA. (ECF No. 32 at 15-16). Plaintiff replies that he is not seeking extra-contractual or punitive damages; rather, Plaintiff requests a "declaration of bad faith or gross negligence." (ECF No. 34 at 19). Plaintiff again turns to § 1132(a)(3) in support of his request for relief. (ECF No. 34 at 19-20).

Defendants are correct that Plaintiff is precluded from seeking extra-contractual or punitive damages under ERISA. *See, e.g.*, *Aliff v. BP Am., Inc.*, 826 F. Supp. 178, 187-88 (S.D.W.Va. 1993) (collecting cases); *see also Patrick v. Calgon Carbon Corp.*, No. 3:10-1108, 2010 WL 4629993, at *7 (S.D.W.Va. Nov. 8, 2010). Defendants also rightfully point out that state statutory or common law claims related to an employee benefit plan are preempted by ERISA, including claims for bad faith and gross negligence. *See, e.g.*, *Custer v. Sweeney*, 89 F.3d 1156, 1166 (4th Cir. 1996) (citing 29 U.S.C. § 1144); *McDonald v. Household Int'l, Inc.*, 425 F.3d 424, 426, 429 (7th Cir. 2005) (gross negligence); *Makar v. Health Care Corp. of Mid-Atlantic (CareFirst)*, 872 F.2d 80, 82 (4th Cir. 1989) (bad faith); *Potter v. Metropolitan Life Ins. Co.*, No 3:11-0363, 2011 WL 6009977, at *1 n.1 (S.D.W.Va. Dec. 1, 2011). Plaintiff seems to concede these two points, but urges that he is still entitled to some unidentified form of equitable relief under § 1132(a)(3). (ECF No. 34 at 19-20). As discussed above, § 1132(a)(3) is essentially a safety net provision of ERISA that is designed to provide equitable relief for those injuries that ERISA's remedial

structural otherwise does not adequately assuage. *See, e.g., Varity*, 516 U.S. at 512. In this case, Plaintiff's claims of bad faith and gross negligence, other than his estoppel-style theory, which is discussed below, relate to the processing of his application for benefits and Defendants' alleged failure to produce documents upon his request. ERISA provides adequate remedies for these claims in allowing actions for recovery of benefits (§ 1132(a)(1)(B)) and document penalties (§ 1132(c)(1)). Consequently, Plaintiff's reliance on § 1132(a)(3) is misplaced, and he cannot bring his bad faith and gross negligence claims under that provision.

For the aforementioned reasons, the undersigned **RECOMMENDS** that the District Court **FIND** that there is no genuine issue of material fact as to Plaintiff's bad faith and gross negligence claim. The undersigned further **RECOMMENDS** that the District Court **GRANT** Defendants' motion for summary judgment on Plaintiff's bad faith and gross negligence claim, and **DENY** Plaintiff's motion for summary judgment on his bad faith and gross negligence claim.

### E. Equitable Estoppel

Plaintiff asserts in his complaint that Defendants should be equitably estopped from denying his disability pension application for a variety of reasons. (ECF No. 3 at 32-33). Some of those reasons have already been addressed throughout this PF&R, e.g. Plaintiff's claim that Defendants should be equitably estopped from applying a plan provision that creates an impossible eligibility requirement in violation of Federal law and Plaintiff's allegation that Defendants are equitably estopped from denying his claim because the SPDs do not comply with ERISA. (*Id.*) Some of Plaintiff's other estoppel claims are not discussed in his briefs at all; instead, Plaintiff focuses his attention on arguing that Defendants should be equitably estopped from denying him disability

benefits based on Mr. Meyers's representations to him and the language contained in the 1999 SPD, which he asserts contains a material misrepresentation as it fails to state that the SSA's onset date finding will be used by the Trustees in deciding disability pension applications.[40] (ECF No. 30 at 37-40; ECF No. 34 at 20-24). In response, Defendants assert that estoppel "requires more than a staff misstatement," and that estoppel is precluded where a plaintiff could have ascertained the truth of a statement using due diligence. (ECF No. 32 at 16). In addition, Defendants aver that "[p]lan staff cannot amend the plan by misstatement or clerical omissions." (*Id.* at 17). Relatedly, Defendants insist that Plaintiff is not entitled to disability pension benefits unless he actually satisfies the plan rules. (*Id.* at 18). Furthermore, Defendants argue that Mr. Meyers's misstatement in affirming Plaintiff's application over the phone could not have induced detrimental reliance. (*Id.* at 19).

In *Amara*, the Supreme Court recognized that a claim for equitable estoppel may be brought under § 1132(a)(3). 131 S.Ct. at 1881; *see also McCravy v. Metropolitan Life Ins. Co.*, 690 F.3d 176, 181 (4th Cir. 2012). While all of the necessary elements of an ERISA estoppel claim were not described by the Supreme Court in *Amara*, the Court did provide some guidance as to what a plaintiff is required to demonstrate before an estoppel-type remedy may be imposed by a court. The Court declared that "when a court exercises its authority under [§1132(a)(3)] to impose a remedy equivalent to estoppel, a

---

[40] Many of the unbriefed reasons are meritless as Plaintiff attempts to argue that he should be afforded benefits based on procedural violations that did not harm him, e.g. his claim that Defendants should be equitably estopped from using any SPD or plan version postdating 2003 as he alleges he did not receive copies of any of those documents. (ECF No. 3 at 32); *cf. Gagliano v. Reliance Standard Life Ins. Co.*, 547 F.3d 230, 240 (4th Cir. 2008) (recognizing that "procedural violation cannot afford [plaintiff ] a substantive remedy if [he] has no entitlement to benefits under the terms of the Plan."). In *Gagliano*, the Fourth Circuit ultimately remanded to the plan administrator for "a full and fair review" based on a defective determination letter. 547 F.3d at 240-41. However, remand is not warranted for any alleged procedural violation with regard to the applicable plan version in this case because the disability pension eligibility language is, for all relevant purposes, identical spanning 1999 to 2010.

showing of detrimental reliance must be made."[41] *Amara*, 131 S.Ct. at 1881. According to the Court, detrimental reliance in this context means "that the defendant's statement in truth, influenced the conduct of the plaintiff, causing prejudice." *Id.* (quoting J. Eaton, Handbook of Equity Jurisprudence § 61, p. 175 (1901)) (markings omitted). Lower federal courts have all agreed that detrimental reliance must be proven by the plaintiff bringing an ERISA estoppel claim. *Pearson v. Voith Paper Rolls, Inc.*, 656 F.3d 504, 509 (7th Cir. 2011); *Bloemker v. Laborers' Local 265 Pension Fund*, 605 F.3d 436, 442-44 (6th Cir. 2010); *In re New Valley Corp.*, 89 F.3d 143, 153 (3d Cir. 1996).

The entirety of Plaintiff's equitable estoppel claims fail because he cannot demonstrate detrimental reliance. In arguing that Mr. Meyers's representations are binding on the Trustees, Plaintiff first points to plan language establishing that "[t]he Trustees may appoint an administrator to . . . exercise all or part of the powers of the Trustees," and that the administrator will have "the authority and discretion necessary . . . to the performance of his duties. (D1073, D1314). Plaintiff further cites a provision of the plan stating that representations by the Trustees, "or those specifically designated" by the Trustees, are binding with regard to benefit eligibility. (D1071, D1313). Based on this plan language, Plaintiff asserts that Mr. Meyers's undisputed statement to Plaintiff that he qualified for disability benefits is binding on the Trustees. (ECF No. 34 at 20-21). Assuming that Mr. Meyers, as Fund Administrator, was authorized under the plan language to make binding statements on behalf of the Trustees, Plaintiff has not explained why Mr. Meyers could not make a subsequent binding statement that Plaintiff was not entitled to benefits after further review of his application. Plaintiff acknowledges

---

[41] To the extent that Plaintiff argues he is not required to prove detrimental reliance in support of his claim for equitable estoppel, he misreads *Amara*. (ECF No. 34 at 23); *Amara*, 131 S.Ct. 1881. Moreover, assuming that Plaintiff seeks equitable relief other than estoppel based on Mr. Meyers's representations, he has not shown the requisite harm to justify equitable relief. *See Amara*, 131 S.Ct. at 1881-82.

that Mr. Meyers called him soon after their initial phone call to tell him that a mistake was made and that Plaintiff was not entitled to a disability pension. With no record evidence of detrimental reliance in between those phone calls, Plaintiff's claim is wholly unconvincing.

It is for that same reason that Plaintiff's claim with regard to Mr. Meyers's statements, setting aside the plan language, must fail. Plaintiff has not produced any evidence that he relied on Mr. Meyers's statements to his detriment, and he has not explained how Mr. Meyers's representations influenced his conduct causing him prejudice. *Amara*, 131 S.Ct. at 1881. Of course, Plaintiff would be hard-pressed to do so, given the temporal proximity of his two phone calls with Mr. Meyers on May 22, 2013, and his intervening phone call with Ms. Keels. Plaintiff has admitted that he took no action in reliance on Mr. Meyers's mistaken statements other than beginning the process of faxing an updated pension application to Mr. Meyers. (ECF No. 30 at 35-36). Because Mr. Meyers was quick to correct his initial oral approval, Plaintiff cannot demonstrate any prejudice, and thus, his estoppel claim based on Mr. Meyers's mistaken representations must be dismissed.[42]

Plaintiff also argues that the 1999 SPD "constitutes a misrepresentation" because it does not state that the SSA's disability onset date finding will be used by the Trustees in deciding a disability pension application. (ECF No. 34 at 21). At the outset, it should be noted that Plaintiff did not plead an estoppel claim related to the 1999 SPD in his complaint. Nevertheless, given Plaintiff's discussion of the claim in both of his briefs, the undersigned will discuss its merits. Similar to the claim discussed above, Plaintiff has not alleged how he relied to his detriment on any purported misrepresentation in the 1999

---

[42] Undoubtedly, Plaintiff's interactions with Mr. Meyers and Ms. Keels were frustrating on May 22, 2013. However, every frustration does not find recourse in the law.

SPD. First, there is no indication that Plaintiff ever saw the 1999 SPD before it was produced to him in 2013. It is certainly a dubious proposition that Plaintiff could have relied on a document that he did not see until after his application for benefits was initially denied. *See Stiltner v. Beretta U.S.A. Corp.*, 74 F.3d 1473, 1478-79 (4th Cir. 1996) (holding that plaintiff failed to demonstrate he relied upon or was prejudiced by inaccuracy in SPD when he did not see copy of SPD until after he suffered disability for which he sought to recover benefits). Second, Plaintiff has not claimed that he would have gone back to work in 2003 if he had known that the SSA onset date would be used by the Trustees. Indeed, there was no way for Plaintiff to know before April 2006 what the SSA would conclude with regard to his disability onset date. Moreover, Plaintiff maintains that he was disabled after December 2002 (although the SSA did not agree), and so, according to him, he could not have worked in 2004 and 2005 to meet the 1000-hour requirement. Additionally, Plaintiff has not alleged that he would have obtained a disability insurance policy from a private insurer had he known that the SSA date of onset was considered controlling by the Trustees. Overall, Plaintiff has not presented any evidence that he even relied on the 1999 SPD, let alone that he was prejudiced by any reliance. Accordingly, his claim for estoppel related to the 1999 SPD founders.

For the aforementioned reasons, the undersigned **RECOMMENDS** that the District Court **FIND** that there is no genuine issue of material fact as to Plaintiff's equitable estoppel claim. The undersigned further **RECOMMENDS** that the District Court **GRANT** Defendants' motion for summary judgment on Plaintiff's equitable estoppel claim, and **DENY** Plaintiff's motion for summary judgment on his equitable estoppel claim.

### F. Fees and Costs

Plaintiff has requested that the Court award him "reasonable fees and costs" under 29 U.S.C. 1132(g)(1), which states: "In any action under this subchapter (other than an action described in paragraph (2)) by a participant, beneficiary, or fiduciary, the court in its discretion may allow a reasonable attorney's fee and costs of action to either party." (ECF No. 3 at 33; ECF No. 30 at 48). Defendants respond that Plaintiff is not entitled to a reasonable attorney's fee as he filed this action *pro se*. (ECF No. 32 at 20). In addition, Defendants contend that his claim for costs is inappropriate because he has not put forth a valid claim. (*Id.*)

The Fourth Circuit has recognized that "[i]n an ERISA action, a district court has discretion under 29 U.S.C. § 1132(g)(1) to award costs and reasonable attorney's fees to either party, so long as the party has (1) achieved some degree of success on the merits, and (2) is entitled to an award under the five factors we set forth in *Quesinberry v. Life Ins. Co. of N. Am.*, 987 F.2d 1017, 1029 (4th Cir.1993)." *Feldman's Med. Ctr. Pharm., Inc. v. CareFirst, Inc.*, 541 F. App'x 322, 323 (4th Cir. 2013). The *Quesinberry* factors focus on whether an award of an attorney's fee is appropriate. *See* 987 F.2d at 1029 ("This five factor approach is not a rigid test, but rather provides general guidelines for the district court in determining whether to grant a request for *attorneys' fees*.") (emphasis added). As Defendants point out, Plaintiff filed this case *pro se*, and thus, he cannot obtain an award of attorney's fees. *See, e.g.*, *Hays v. Town of Gauley Bridge, WV*, No. 2:09-1272, 2012 WL 930332, at *3 n.2 (S.D.W.Va. Mar. 19, 2012).

With respect to Plaintiff's request for costs, it may be premature at this juncture to recommend a resolution on the issue of costs given that the undersigned has recommended that the District Court find that a genuine issue of material fact exists in

regard to Plaintiff's document production claim pertaining to his June 3 request. Nevertheless, the undersigned finds that Plaintiff has "achieved some degree of success on the merits." *Feldman's Med. Ctr. Pharm., Inc.*, 541 F. App'x at 323. An ERISA plaintiff "need not establish 'substantial success' or success on a 'central issue,' but merely something more than 'trivial success on the merits' or a 'purely procedural victor[y].'" *Board of Trs. For Hampton Roads Shipping Ass'n-Int'l Longshoremen's Ass'n v. Ransone-Gunnell*, 781 F. Supp. 2d 286, 290 (E.D. Va. 2011) (quoting *Hardt v. Reliance Standard Life Ins. Co.*, 560 U.S. 242, 255, 130 S.Ct. 2149, 176 L.Ed.2d 998 (2010)). In view of the undersigned's finding that Plaintiff achieved some success on the merits of his document production claim, the undersigned **RECOMMENDS** that the District Court **FIND** that an award of costs is appropriate in this case in an amount to be determined at a later date in accordance with Local Rule of Civil Procedure 54.1.

## V.    **Proposal and Recommendations**

For the reasons set forth above, the undersigned respectfully **PROPOSES** that the United States District Judge accept and adopt the findings herein and **RECOMMENDS** Plaintiff's motion for summary judgment, (ECF No. 29), be **GRANTED in part** and **DENIED in part**; Defendants' motion for summary judgment, (ECF No. 31), be **GRANTED in part** and **DENIED in part**; the District Court **FIND** that a genuine issue of material fact exists as to part of Count III; and the District Court **AWARD** the sum of Seven Thousand Four Hundred Fifty Dollars and No Cents ($7,450.00) to Plaintiff.

The parties are notified that this "Proposed Findings and Recommendations" is hereby **FILED**, and a copy will be submitted to the Honorable Robert C. Chambers, United States District Judge. Pursuant to the provisions of Title 28, United States Code,

Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall have fourteen days (filing of objections) and three days (mailing) from the date of filing this "Proposed Findings and Recommendations" within which to file with the Clerk of this Court, specific written objections, identifying the portions of the "Proposed Findings and Recommendations" to which objection is made and the basis of such objection. Extension of this time period may be granted by the presiding District Judge for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Court and a waiver of appellate review by the Circuit Court of Appeals. *Snyder v. Ridenour*, 889 F.2d 1363 (4th Cir. 1989); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984). Copies of such objections shall be provided to the opposing parties, Judge Chambers and Magistrate Judge Eifert.

The Clerk is instructed to provide a copy of this "Proposed Findings and Recommendations" to the Plaintiff, counsel of record, and any unrepresented party.

**FILED:** April 6, 2015

Cheryl A. Eifert
United States Magistrate Judge